NOT RECOMMENDED FOR PUBLICATION
File Name: 04a0079n.06
Filed: November 10, 2004

No. 03-5620

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

JEFFREY JOHNSON and JOHN GOODWIN,

    Plaintiffs-Appellants,

v.

UNITED PARCEL SERVICE, INC.,

    Defendant-Appellee.

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE

_____/

BEFORE:    CLAY and GILMAN, Circuit Judges; O'Malley, District Judge.[*]

    **CLAY, Circuit Judge.** Plaintiffs, Jeffrey Johnson and John Goodwin, appeal from the order

entered by the United States District Court for the Eastern District of Tennessee, on March 26, 2003,

granting judgment as a matter of law to Defendant United Parcel Service ("UPS"), so as to dismiss

with prejudice Plaintiffs' claims in this action for employment discrimination on the basis of race,

under Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, 42 U.S.C. § 1981 and the

Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101 *et seq.* For the reasons set forth below,

we **AFFIRM** the district court's order as to the disparate treatment claims of both Plaintiffs, and we

---

[*]The Honorable Kathleen M. O'Malley, United States District Judge for the Northern District
of Ohio, sitting by designation.

**REVERSE** the district court's order and **REMAND** for a new trial on Plaintiffs' racial harassment claims under federal and state law.

## BACKGROUND

### *Procedural History*

On September 15, 2000, Plaintiffs in the present appeal, Jeffrey Johnson and John Goodwin, as well Johnny L. Boyd, Eric Kelley, Ken Cameron, Donnie Ware, Eddie J. Thomas, Jr., and Gregory Owens, filed a complaint alleging violations of Title VII, 42 U.S.C. § 1981 and the Tennessee Human Rights Act. An amended complaint was filed on August 10, 2001.

On September 13, 2001, the claims of Johnny L. Boyd were dismissed with prejudice, by agreed stipulation. On January 14, 2002, a second amended complaint was filed. On February 26, 2002, a third amended complaint was filed; this was the final complaint filed, and it was filed by all the plaintiffs to the original complaint, except for Boyd. The third amended complaint charged Defendant UPS with violations of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, and violations of 42 U.S.C. § 1981 and the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101 *et seq.*, as a result of racial discrimination against the plaintiffs, all of whom are African-American, in the form of disciplinary actions and the denial of promotion, as well as the existence of a hostile work environment on the basis of race; the complaint also charged retaliation.

In April, July, and August of 2002, a jury trial was conducted, lasting eleven days. Before the case reached the jury, Defendant filed a motion for judgment as a matter of law, pursuant to FED. R. CIV. P. 50. On August 6, 2002, arguments were heard on this motion, and a ruling was issued from the bench by the district court, dismissing with prejudice numerous claims, including all claims

2

of Plaintiffs Johnson and Goodwin, the parties to the present appeal. On August 7, 2002, the trial continued with respect to Ware's retaliation claim and Cameron's hostile work environment claim.

On August 28 and 30, 2002, Plaintiffs Johnson and Goodwin appealed. On September 24, 2002, in an unpublished decision, the appeal of Plaintiff Johnson was dismissed by this Court for lack of appellate jurisdiction, on grounds that no ruling had yet been entered terminating all issues in the case as to all litigants and that no appealable order as to Johnson had been issued under FED. R. CIV. P. 54(b) (allowing a court to enter a final judgment as to one party in a multi-party action, before final judgments have been entered as to all parties in the action).

The trial concluded on November 4, 2002.[1] On March 26, 2003, a final order was entered, dismissing with prejudice the claims of Johnson and Goodwin.

On April 23, 2003, Plaintiffs filed a timely notice of appeal.

### *Substantive Facts*

Plaintiff Johnson was hired by Defendant, UPS, in 1984 as a package car driver and remains employed with Defendant in this capacity as of the time of the most recent filings in the case. Plaintiff Johnson sought but was denied promotions into management positions. Plaintiff Johnson filed an administrative complaint with the U.S. Equal Opportunity Commission ("EEOC"), in April of 2000, at which time Johnson also served as a union steward for the Teamsters.

Plaintiff Goodwin began work part-time with Defendant in 1988, began to work full-time as a package car driver in 1994, and remains employed with Defendant in this capacity as of the time

---

[1]The jury found in favor of Ware on the retaliation claim, awarding a total of $125,000 (comprised of $45,133 in mental or emotional injury and $79,867 in back pay). The jury found in favor of Defendant on Cameron's hostile work environment claim.

of the most recent filings in the case. Plaintiff Goodwin filed an EEOC charge against Defendant in March of 2000.

Plaintiffs present an in-depth account of facts relating to their claims. However, because the factual allegations of the two Plaintiffs differ, and because each Plaintiff presents a separate set of factual allegations for the claims of disparate treatment and of hostile work environment, explaining all of the details together here could become confusing. Consequently, for the sake of clarity, factual details are provided in the sections analyzing the claims, below.

## DISCUSSION

Plaintiffs Johnson and Goodwin raise two issues. First, Plaintiffs argue that the district court erred in granting judgment as a matter of law to Defendant on their claims for disparate treatment on the basis of race. Secondly, Plaintiffs contend that the district court erred in granting judgment as a matter of law to Defendant on their claims for racially hostile work environment. We regard all claims as alleging discrimination under both Title VII and the Tennessee Human Rights Act, although hereafter we rely solely on federal law.[2]

_____

[2]On appeal, Plaintiff never argues that 42 U.S.C. § 1981, pertaining to the right to make and enforce contracts, was violated. Thus, this issue (stated in the complaint) is waived.

None of the parties expressly argues whether the appeal pertains only to the federal claims or also to the state claims. It appears to us that Plaintiffs appeal not only their federal claims but also their state law claims. The prohibitions on discrimination in the Tennessee Human Rights Act are generally coterminous with those under Title VII of the Civil Rights Act of 1964. The relevant language of the state statute is almost identical to Title VII, and is not different in any way that is material to the instant case. 42 U.S.C. § 2000e-2(a); Tenn. Code Ann. § 4-21-401(a). Although Tennessee courts are not bound to construe state law discrimination claims in a manner consistent with federal courts' interpretations of Title VII, *see Carr v. Robertson County*, 29 S.W.3d 466, 474 (Tenn. 2000), Tennessee courts have often tried to preserve consistency between federal and state discrimination law. *E.g.*, *Parker v. Warren County Util. Dist.*, 2 S.W.3d 170, 176 (Tenn. 1999) ("we hold that the stated purpose behind the enactment of our THRA will be best served by maintaining

We take the two issues in order, examining each Plaintiff's factual circumstances separately, under each issue.

This Court has stated:

> We review *de novo* a district court's decision to grant judgment as a matter of law under Rule 50(a). . . . Judgment as a matter of law on a specific issue is appropriate when, viewing the evidence in the light most favorable to the nonmovant, (1) "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue" or (2) the nonmovant's position on that issue represents "a claim or defense that cannot under the controlling law be maintained." Fed. R. Civ. Proc. 50(a) . . . .

*Diamond v. Howd*, 288 F.3d 932, 935 (6th Cir. 2002) (citations omitted).

## I.

Plaintiffs argue that the district court erred in granting judgment as a matter of law on their claims of disparate treatment on the basis of race.

### A. Legal Framework

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating "because of . . . race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). In a Title VII case, a plaintiff bears the ultimate burden of persuading the factfinder that the defendant intentionally discriminated against the plaintiff. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143

---

continuity between our state law and the federal law on the issue of imposing employer liability for supervisor sexual harassment. We, therefore, adopt the Supreme Court's recently articulated standard of vicarious liability in all supervisor sexual harassment cases."); *Spann v. Abraham*, 36 S.W.3d 452, 465, 465 n.7 (Tenn. Ct. App. 1999) (applying federal law regarding disparate treatment to state claims). At trial, the verdict form as to the claims of Cameron and Ware (both of whose claims were brought pursuant to both federal and state law) did not distinguish between federal and state harassment claims. Consequently, our discussion of Plaintiffs' claims pertains to both state and federal claims.

(2000). Unlawful discrimination need not be the only reason for an adverse employment action, to violate Title VII, but rather need only be an essential component of an employer's mixed motive.[3] A plaintiff may carry the burden by introducing direct evidence which shows that in treating a plaintiff adversely the defendant was motivated by discriminatory intent, or by introducing circumstantial evidence that supports an inference of discrimination. *Logan v. Denny's, Inc.*, 259 F.3d 558, 566-67 (6th Cir. 2001).

Where, as here, plaintiffs' evidence is circumstantial, a disparate treatment claim proceeds through a three-step framework. First, a plaintiff bears the burden of making a *prima facie* showing by demonstrating that 1) she is a member of a protected class; 2) she was qualified for the job and performed it satisfactorily; 3) despite her qualifications and performance, she suffered an adverse employment action; and 4) she was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside her protected class. *Id.* at 567 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), as later clarified by *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). The *prima facie* test is meant as a relatively light burden. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (a Title VII case, stating, "The burden of establishing a *prima facie* case of disparate treatment is not onerous.").

---

[3]*Price Waterhouse v. Hopkins*, 490 U.S. 228, 240-41, 104 L. Ed. 2d 268, 109 S. Ct. 1775 (1989). In a mixed motive case, where direct evidence of discriminatory intent is produced, the burden shifts to the employer to show by a preponderance that the adverse employment action would have been taken even if the discriminatory motive had not existed. *Wexler v. White's Fine Furniture*, 317 F.3d 564, 571 (6th Cir. 2003) (describing *Price-Waterhouse*).

If plaintiffs carry that burden, then, in the second step in the framework, the defendant faces the burden to offer a legitimate, nondiscriminatory reason for the adverse employment action. *Reeves*, 530 U.S. at 142. "This burden is one of production, not persuasion; it 'can involve no credibility assessment.' *St. Mary's Honor Center*, *supra*, at 509." *Id.* at 143.

If the defendant carries its burden, then, in the final stage in the process, plaintiffs may demonstrate to the factfinder that the defendant's proffered reason is a mere pretext for intentional discrimination. *Id.* at 142-43. The factfinder may consider the evidence and inferences from the plaintiff's *prima facie* case, along with other evidence. *Id.* at 143. In showing pretext, plaintiffs bear the burden of disproving the defendant's proffered reason by a preponderance of the evidence. *Id.* Methods of disproving the defendant's reason include demonstrating that the reason 1) had no basis in fact, 2) was not the actual reason, and 3) was insufficient to explain the defendant's action. *Logan*, 259 F.3d at 567. To make a showing of pretext, in addition to disproving the defendant's stated reason, the plaintiff must also show by a preponderance of the evidence that the true motivation for the adverse employment action included intentional discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) ("a reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, and that discrimination was the real reason.") (emphasis in original). From an evidentiary standpoint, in some (but not all) cases, sufficient evidence of discriminatory intent may come solely from the *prima facie* case. *Reeves*, 530 U.S. at 147-48.

On appeal Defendant contests only the third *prima facie* element (an adverse employment action) and the fourth element (treatment less favorable than that accorded to a similarly situated

7

individual outside of the protected class) of the disparate treatment claims of Plaintiffs Johnson and Goodwin.

## B. Johnson's claim

Plaintiff Johnson argues that there were four adverse employment actions (any one of which would have been sufficient to satisfy the third element of the *prima facie* case). Plaintiff contends that a written reprimand was issued, threatening to terminate Johnson if he continued to engage in the practice of moving his name on the staffing board that assigned drivers to routes. Plaintiff also argues that there was discrimination in scheduling, in not allowing him to move his name on the staffing board; Plaintiff states, "Mr. Johnson . . . was denied the right to exercise his seniority under the contract[4] with respect to delivery routes, requiring him to take more difficult workloads and assignments." (Plaintiffs' Br. at 22.) Allegedly, drivers with less seniority than Plaintiff were allowed to switch their names (and thereby alter their assignments) on the staffing board. Plaintiff also alleges discrimination as a result of Defendant not promoting him, after he submitted multiple letters (pursuant to Defendant's promotion procedure requirements), requesting promotion to management. Finally, Plaintiff alleges discrimination in training, stating that Defendant "fail[ed] to train him on rural delivery areas when it had agreed to do [so] more than a year before." (Plaintiffs' Br. at 22-23.)

Examining each of these instances individually, none appear to satisfy both the third and fourth elements of the *prima facie* case. Regarding the written reprimand, Plaintiff concedes that

---

[4]The collective bargaining agreement specifies that "seniority will be considered when making work assignments." (J.A. at 599.)

no EEOC charge was filed within the statute of limitations. On this basis, Plaintiff admits that there is no adverse employment action here; at most, there is background evidence of discrimination that would be relevant to other charges of discrimination. *AMTRAK v. Morgan*, 536 U.S. 101, 113 (2002).

Regarding scheduling, this does not appear to be an adverse employment action. Case law indicates that, absent changes in salary or the number of hours of work, scheduling matters would not normally classify as potential adverse employment actions. *Kocsis v. Multi-Care Mgmt.*, 97 F.3d 876, 885 (6th Cir. 1996) ("reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims. *Yates v. Avco Corp.*, 819 F.2d 630, 638 (6th Cir. 1987)"); *see also White v. Burlington Northern & Santa Fe Ry.*, 364 F.3d 789, 800 (6th Cir. 2004) (en banc) ("we reaffirm the definition [of adverse employment action] that we have developed in cases such as *Kocsis* and its progeny.").

Regarding failure to promote, as stated in *Nguyen v. City of Cleveland*:

> [A] failure to promote is an adverse employment action. In order to establish a prima facie case of racial discrimination based upon a failure to promote, the plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he applied for and was qualified for a promotion, (3) he was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions at the time the plaintiff's request for promotion was denied.

229 F.3d 559, 562-63 (6th Cir. 2000) (citations omitted). Hence, Plaintiff meets the third element of the *prima facie* case. But Plaintiff fails to allege that promotions were given to employees outside of the protected class–nor does Plaintiff point to any evidence suggesting such a conclusion.

Consequently, Plaintiff fails to satisfy the fourth *prima facie* element for discriminatory failure to promote. Moreover, Plaintiff does not counter Defendant's assertion that this claim is time-barred.

Regarding training, the allegation that Plaintiff was not trained on rural deliveries does not meet the standard for adverse employment action that is described above, of "a materially adverse change in the terms and conditions of employment" that is "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Bowman v. Shawnee State Univ.*, 220 F.3d at 461. Nor does Plaintiff even allege that similarly-situated employees outside of the protected class were given the type of training on rural delivery routes in question (to satisfy the fourth *prima facie* element).

Overall, Plaintiff Johnson fails to make out a *prima facie* case for disparate treatment. For the only adverse employment action, failure to promote, Plaintiff failed to allege that the fourth *prima facie* element was met.

## C. Goodwin's claim

Plaintiff Goodwin alleges three adverse employment actions. First, Plaintiff alleges having been wrongfully suspended. The collective bargaining agreement authorizes supervisors to ride with drivers, on occasion, to monitor their productivity. According to the trial testimony of union business agent Wes Trotterchaud, the supervisor-monitored runs were directed disproportionately at black employees. Plaintiff states that supervisor Steve Burtnett rode with Plaintiff and established the rate at which Plaintiff could make deliveries. Although the collective bargaining agreement forbade supervisors from assisting the drivers during the rides–presumably because this would inflate the delivery rate to which drivers would later be held–Plaintiff asserts that Burtnett "actually

helped deliver packages" during the ride. Later, Burtnett notified Plaintiff of Burtnett's intent to suspend Plaintiff for failing to meet the delivery rate established with Burtnett's help. Secondly, Plaintiff had filed grievances alleging that Burtnett supervised him too closely by engaging in an excessive number of supervised rides. Finally, Plaintiff alleges discriminatory failure to promote, in denying his application for a position in the feeder department, "which is the 18-wheeler department." (J.A. at 164).

Regarding the alleged suspension, this Court has held that an employee who was suspended and later, as a result of a union grievance procedure, was reinstated with full back pay had suffered an adverse employment action. *Burlington Northern*, 364 F.3d at 800-03; *but see id.* at 803 ("a suspension with pay and full benefits pending a timely investigation into suspected wrongdoing is not an adverse employment action.") (citing *Jackson v. City of Columbus*, 194 F.3d 737, 752 (6th Cir. 1999)). However, there is no evidence that Plaintiff was actually suspended. According to Plaintiff's trial testimony, Burtnett notified Plaintiff of his intent to suspend Plaintiff, but a union grievance procedure was required, before Plaintiff could be suspended. Plaintiff prevailed in this procedure and, consequently, was never suspended. Hence, there is no adverse employment action, here.

Regarding the alleged problem of close supervision, the allegation here does not meet the definition of an adverse employment action, as set forth above. Also, on the fourth *prima facie* element, Plaintiff failed to allege that similarly situated individuals outside of the protected class were supervised less closely. (J.A. at 173) (Plaintiff Goodwin, on cross-examination, admitted to not knowing how closely other employees were supervised).

11

Regarding failure to promote, the analysis is a bit more complicated. At issue is the fourth element of the *prima facie* case; as stated above, this element requires that other employees with similar qualifications outside of the protected class received promotions when the plaintiff's request was denied. In direct examination, Plaintiff recounted that a white driver, Ralph Kennedy, applied for the feeder department; Kennedy had a driving accident on his record, meaning that under established procedures he should have been ineligible for the promotion for one year. However, after a one-month disqualification, Kennedy was promoted. There is a question as to whether or not Kennedy was similarly situated. Defendant refers to Kennedy as a "higher seniority driver." Plaintiff has not countered this. Thus, it is not clear that Plaintiff has presented sufficient evidence to meet the somewhat demanding standard for being "similarly situated." *E.g., Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) (describing a demanding standard for being similarly situated). We need not decide whether Plaintiff has met the standard for similarly situated, because the claim fails otherwise.

Even if, *arguendo*, Plaintiff has met the *prima facie* burden for the failure to promote claim, Plaintiff fails to show pretext. It appears that Plaintiff's own direct testimony provides Defendant's legitimate, non-discriminatory reason for promoting Kennedy instead of Plaintiff. As Plaintiff admitted at trial, the manager was engaging in favoritism, because Kennedy's father got the manager his first job.

Any motivation that is not tied to the prohibited grounds will suffice to meet a defendant's burden to produce a legitimate, non-discriminatory reason for the adverse employment action. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981) ("The explanation provided [by a

defendant] must be legally sufficient to justify a judgment for the defendant."). Hence, Defendant's reason ("favoritism") would be legitimate under Title VII. Plaintiff does not attempt to disprove this motive; consequently, Plaintiff fails to allege pretext regarding failure to promote, which is the only adverse employment action that Plaintiff has established.

There is not sufficient evidence to support a jury finding in favor of either Plaintiff, on a disparate treatment claim.

## II.

Plaintiffs also argue that the district court erred in granting judgment as a matter of law on their claims of racial harassment.

### A. Legal Framework

Under Title VII, a plaintiff may show unlawful discrimination by demonstrating the existence of a hostile work environment:

> In order to establish a prima facie case of hostile work environment based on either race or religion, [a plaintiff] must establish the following five elements:
>
> 1. He was a member of a protected class;
>
> 2. He was subjected to unwelcomed racial and/or religious harassment;
>
> 3. The harassment was based on race or religion;
>
> 4. The harassment had the effect of unreasonably interfering with Hafford's work performance by creating an intimidating, hostile, or offensive work environment; and
>
> 5. The existence of employer liability.

*Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999) (citation omitted); *accord Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462-63 (6th Cir. 2000) (sexual harassment).

13

There is an affirmative defense–namely that in a harassment case an employer may avoid liability by showing that the employer had taken reasonable care to prevent and correct harassment and that the plaintiff failed to avail himself or herself of the employer's mechanisms for redressing harassment. *See EEOC v. Harbert-Yeargin, Inc.*, 266 F.3d 498, 510 (6th Cir. 2001).

Looking at certain of the elements more closely, under the fourth element: "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances." *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993). Here, there is a subjective component: the plaintiff must regard the environment as abusive. *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000). Also, to be actionable, harassment must be severe or pervasive, creating an objectively hostile work environment (for a reasonable person), thus altering the conditions of employment. *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 81 (1998); *Bowman*, 220 F.3d at 463. Relevant considerations in determining whether conduct is actionable "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys.*, 510 U.S. at 23; *Goldmeier v. Allstate Ins. Co.*, 337 F.3d 629, 635 (6th Cir. 2003) (quoting these factors from *Harris*).

Under the fifth element, employer liability is established if the harassment was by a supervisor; if the harassment was by co-workers, then there is employer liability if the employer had actual or constructive knowledge of the harassment. *Jackson v. Quanex Corp.*, 191 F.3d 647, 663 (6th Cir. 1999).

**B. Johnson's claim**

Plaintiff Johnson presents trial testimony that is probative of harassment. Plaintiff testified that in July of 1999: "[supervisor ] Steve Burtnett came up to me and told me that Jimmy Buquo was going to ride with me this day . . . , and he was gong to haul me around all day, and I was to listen with my ears and eyes wide open." (J.A. at 198-99). Plaintiff was upset by the term "haul." When Plaintiff spoke with Chatanooga division manager Gary Todd about this, Todd expressed some sympathy. However, regarding Plaintiff's plan to file a grievance based upon alleged racial discrimination, Todd "said he's tired of African Americans complaining." (J.A. at 201.)

Plaintiff's trial testimony described a July 20, 1999 grievance. A supervisor had "trained [Johnson] to sheet each package as a different stop." (J.A. at 212.) Yet, Plaintiff testified that when he began following this practice, another supervisor, Steve Burtnett, accused him of "stealing, falsifying records and stealing company time." (J.A. at 206.) These accusations provided grounds for termination on the spot. In fact, another African-American employee, John Boyd, had recently been fired for "stealing time," i.e., reporting working hours that exceeded the actual amount of time that the employee had worked, for instance, by taking a break longer than that permitted. To disprove the "stealing time" allegation, Plaintiff requested records relating to his training, but this request was not granted.

Around this time, Plaintiff spoke with union business agent Wes Trotterchaud about Plaintiff's grievances for racial discrimination. Trotterchaud stated that Defendant would not address the grievance, because Todd harbored racial animus. As Plaintiff stated at trial, "Gary [Todd] likes to tell jokes, from what I hear from Wes [Trotterchaud], and he loves to talk about black this, black that, and he's a racist." (J.A. at 209.) At trial, Trotterchaud testified that on at least ten

15

occasions, Todd had mocked African Americans, for instance, by mimicking stereotypical speaking styles of African-Americans.

At trial, Plaintiff also related another incident involving Todd. On a morning, at some point in 2000, Plaintiff and Gregory Owens (who also was a Plaintiff in this action originally) had overheard a conversation between Todd and Trotterchaud, in which Plaintiff and Owens "heard [Todd use] the word nigger." (J.A. at 210) (emphasis in original). When Plaintiff and Owens approached Trotterchaud, after hearing this, Trotterchaud "was kind of bashful at first, and he finally told me [Johnson] – he didn't go into any details, but he said, 'Man, he mocks the way you-all talk and act.'" (J.A. at 210.)

Regarding this particular incident, Plaintiff testified, "It hurt. In the year 2000 . . . I didn't expect to hear anything like that from a man of his position." (J.A. at 210); *id.* ("The man in his position is the man who ultimately determines what discipline you receive at that center . . . ."). Plaintiff testified that he "lost trust" in Todd, also because of his perception that "blacks started getting fired once they arrived [at the Chatanooga center]." (J.A. at 211.)

Additionally, there was a November 1999 incident in which, while making racial comments, white employee John Althoff hit black employee Eddie J. Thomas, Jr. in the face with a package. Plaintiff offered trial testimony regarding this incident; he was aware of the incident although he was not present when it occurred. At some point prior to the incident, Althoff had made racial comments that led to his being suspended for two weeks. Althoff was suspended for only one day for the incident involving Thomas, even though under Defendant's zero tolerance policy Althoff could have been terminated. Thomas was later terminated for falsifying his employment application. At trial,

Thomas testified that Althoff had initiated all physical contact between the two of them. There is no indication that Defendant ever offered other employees any explanation for the lenient treatment of Althoff, such as a finding that Thomas had somehow provoked Althoff.

Finally, Plaintiff points to other incidents involving Burtnett. According to Trotterchaud, Burtnett and others attempted to discipline Plaintiff for wearing his prescription sunglasses while indoors. Also, Burtnett approached Plaintiff about taking too long for his deliveries, even though Johnson was ahead of schedule at the time.

Plaintiff also testified that the overall situation led him to seek "professional help" and caused him to revise his earlier plan to work at Defendant until retirement. (J.A. at 230.)

The various considerations of *Harris v. Forklift* must be examined. The frequency of discriminatory conduct was considerable, over the time period in question.[5] The fact that Althoff received only meager punishment for striking Thomas in the face with a package, while emitting racial slurs, made the workplace somewhat "physically threatening." *Harris v. Forklift Sys.*, 510 U.S. at 23.

It is also true that the discriminatory conduct was severe. Case law makes clear that the use of the word "nigger," even taken in isolation, is not a "mere offensive utterance." *E.g.*, *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1116 (9th Cir. 2004); *Spriggs v. Diamond Auto Glass*, 242 F.3d

---

[5]In or about July 1999, Todd "said he's tired of African Americans complaining." (J.A. at 201.) The July 20, 1999 grievance described Burtnett's accusations of "time stealing" and Trotterchaud's description of Todd's racial humor and animus. Althoff struck Thomas, while making racial slurs, in November of 1999. Todd allegedly used the word "nigger" at some point in 2000.

179, 185 (4th Cir. 2001). In the instant case, the fact that the slur was allegedly uttered by the division manager, Todd, would have greatly increased its severity.

Burtnett's accusation of Plaintiff's "stealing time" was also severe because, standing alone, it would have provided grounds for immediate termination. Nor can we discount Todd's statement, directed at Plaintiff, that "he's tired of African Americans complaining." (J.A. at 201.) The fact that, as division manager, Todd was such an integral figure in the grievance process–and expressed this racially-derogatory comment *in the context of responding to Johnson's July 2000 grievance*–is significant.

Viewing the evidence in the light most favorable to Plaintiff as the nonmovant, the conditions of employment were altered, by an environment of management hostility towards African-Americans. Plaintiff's subjective feelings of hurt and loss of trust were objectively reasonable.

In rebuttal, Defendant argues that there is no evidence that certain of Burtnett's actions toward Plaintiff Johnson were racially motivated. This is true; however, incidents cannot be viewed individually but rather must be seen in the totality of the circumstances. *Harris v. Forklift Sys.*, 510 U.S. at 23.[6]

There were certain incidents that clearly established racial harassment. Regarding Plaintiff's testimony as to having overheard Todd use the word "nigger" during a conversation with

---

[6]Contrary to the dissent's approach, incidents of harassment which appear on the surface to be race neutral should not be singled out, but rather should be analyzed in context and as part of the totality of the circumstances. *See Williams v. General Motors Corp.*, 187 F.3d 553, 563 (6th Cir. 1999) ("This totality-of-the circumstances examination should be viewed as the most basic tenet of the hostile-work-environment cause of action.")

Trotterchaud, Defendant points out that Trotterchaud would not confirm this at trial. (J.A. at 292) ("I don't recall him ever using inappropriate language."). Defendant also points to Plaintiff's failure to establish the context in which the word was used; Defendant goes so far as to speculate, "In fact, Todd may have been admonishing Trotterchaud not to use the word." (Respondent's Br. at 41 n.11.)

Defendant's arguments regarding Todd's alleged use of the word "nigger" would be permissible before a jury, but these arguments have no relevance in the present proceeding. In ruling on a motion for judgment as a matter of law, the evidence must be viewed in the light most favorable to the nonmovant. Trotterchaud's failure to recall whether inappropriate language was used is ambiguous–Trotterchaud never testified as to having a good recollection for such matters. Trotterchaud is not African-American and did not necessarily have high sensitivity to such remarks.

Given Todd's other statements regarding African-Americans (the statement that he was tired of complaints by African-Americans and the mocking behavior), the differing testimony regarding Todd's alleged use of the word "nigger" must be resolved in Plaintiff's favor, in a ruling on Defendant's motion for judgment as a matter of law. It must be assumed that, as Johnson testified, the word was used. Also, given Todd's other statements, it was reasonable for Plaintiff to be upset at the use of this word–instead of believing that the word was used to admonish Trotterchaud. The theory now set forth by Defendant–that Todd used the word to admonish Trotterchaud not to say the slur himself–was not supported by any trial testimony; viewing the evidence in the light most favorable to Plaintiff as the nonmovant we must infer that the term was not used in the manner that Defendant now alleges. *See Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) ("the Fifth Amendment

does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them").

Defendant states that Todd's alleged mocking of African-Americans is not harassment, because "the only specific example Trotterchaud provided was about Johnson's approach as a union steward, not his race." (Respondent's Br. at 41.) Although Trotterchaud recounted Todd's mocking of Johnson's approach as a union representative, this mocking was apparently racially oriented. (J.A. at 291) (the mocking of "the way African Americans talk.").

In addition to these arguments, Defendant also cites to an unpublished case, which states, "We have held in the past that the gender-based comments are of diminished probative value when they are not directed at the plaintiff." *Bryant v. Martinez*, 46 Fed. Appx. 293, 297 (6th Cir. 2002) (citing *Smith v. Leggett Wire Co.*, 220 F.3d 752, 761 (6th Cir. 2000)). Defendant argues, based on this authority, that racially derogatory comments are not actionable unless specifically directed at a plaintiff. To be sure, harassment will be more severe if offensive comments were directed at a plaintiff. *Leggett Wire*, 220 F.3d at 760; *Burnett v. Tyco Corp.*, 203 F.3d 980, 984 (6th Cir. 2000).

Nonetheless, Defendant's argument fails. Contrary to the statement in the unpublished *Bryant* opinion, this Court has made clear that a comment need not be "directed at" a plaintiff, in order to constitute harassment. *Jackson v. Quanex Corp.*, 191 F.3d 647, 661 (6th Cir. 1999) ("in the sexual harassment context, this Court has deemed probative remarks that demeaned women generally while not demeaning any one woman in particular."). In fact, *Quanex* also clarified that a plaintiff need not even witness remarks or behavior first-hand, in order to allege that the remarks or behavior contributed to a hostile work environment. *Id.* at 661. Thus, Trotterchaud's telling

20

Plaintiff of Todd's mocking behavior and racial animus provides relevant evidence,[7] which must be taken as credible, viewing the evidence in the light most favorable to Plaintiff as the nonmovant. Hence, Defendant's attempt to diminish the significance of remarks not "directed at" a plaintiff is largely nullified by *Quanex*'s ruling that such remarks can prove relevant.

Additionally, it is significant that certain instances of harassment were, in fact, "directed at" Plaintiff. Todd's statement about being tired of complaints by African-Americans was directed at Plaintiff, in the context of Plaintiff's discussion of a racial grievance. Also, Burtnett's "stealing time" allegation was directed at Plaintiff–although this statement did not explicitly mention race, the statement still may be considered as evidence of harassment, in the totality of the circumstances. *Landrau-Romero v. Banco-Popular de Puerto Rico*, 212 F.3d 607, 614 (1st Cir. 2000) ("Alleged conduct that is not explicitly racial in nature may, in appropriate circumstances, be considered along with more overtly discriminatory conduct in assessing a Title VII harassment claim.") (citation omitted); *see also Harris v. Forklift Sys.*, 510 U.S. at 23 (the harassment inquiry evaluates the totality of the circumstances). Viewing the evidence in the light most favorable to Plaintiff as the nonmovant, it would be reasonable to accept Plaintiff's testimony that in actuality Plaintiff was not "stealing time" and thus to infer that Burtnett's allegations were based on stereotyping, i.e., Burtnett made the accusation simply because another African-American employee (Boyd) had recently been discharged for "stealing time."

---

[7]The statement was admissible under the hearsay exception for an admission by a party-opponent. FED. R. EVID. 801(d)(2).

Hence, Defendant fails in the argument that the offensive remarks were not directed at Plaintiff. There were certain remarks, directed at Plaintiff, that provide relevant evidence of a hostile work environment, on the basis of race; also, there were other incidents not directed at Plaintiff that nonetheless can be considered, under *Quanex*.

Defendant's rebuttals do nothing to sway our earlier conclusion that, viewing the evidence in the light most favorable to Plaintiff as the nonmovant, there is sufficient evidence to support a finding in favor of Plaintiff. The district court erred in granting judgment as a matter of law to Defendant on Plaintiff Johnson's claim of racial harassment.

**C. Goodwin's claim**

Like Plaintiff Johnson, Plaintiff Goodwin testified that he had knowledge of the incident involving Althoff striking Thomas, while emitting slurs. In fact, Goodwin testified as to Thomas' termination.

In making the harassment claim, Plaintiff Goodwin reiterates the allegation (also made in Plaintiff's disparate treatment claim) that Burtnett supervised him too closely, engaging in an excessive number of supervised rides. According to Trotterchaud's trial testimony, these supervised rides were unpleasant–"I call them 'harassment rides'"–and were directed disproportionately at black employees. (J.A. at 302.) Also, Plaintiff testified at trial that during the course of the attempted suspension (in June of 1999), Burtnett once began "screaming at" Plaintiff to roll down his sleeves, even though white employees were allowed to have their sleeves rolled up. (J.A. at 150.) Here, Plaintiff had contact with Todd, who told him to leave the building.

Plaintiff's testimony described daily employee meetings, each morning, at which African-Americans were given less latitude (than white employees) to interact freely with peers:

> the white guys . . . constantly play. Like, a supervisor wears a suit to work every day. They will take the supervisor's coat, hang it off the television, drag it on the floor . . . just really cutting up. And then if I'm standing there and perhaps lean to whisper to another black, the meeting will stop, and it's like, "We need your attention." But all of this other chaos . . . goes on daily at the meeting. But as far as blacks go who are there at the meeting . . . there is no talking–"We need you to be up front. We need you to be paying attention to what we are telling you."

(J.A. at 169.)

> Also Plaintiff recounted at trial that in 1994:

> when I was off hurt with an injury that management had caused to me, not of my own wrongdoing, Mr. Milligan [who was Plaintiff Goodwin's manager] was calling me during that Christmas holiday, telling me how I was going to have a slim Christmas, and at the same time taking up money for hurt white drivers.

(J.A. at 162.)

Additionally, in 1993, Plaintiff applied for a driver position in the "north center" but was denied the position, which allegedly was awarded to a white driver who had less seniority. (J.A. at 143.) In connection with this situation, Goodwin testified that "one of the drivers asked me was I going to the north center . . . . And Mike Clements, who was the north center manager[,] comment[ed] . . . , 'No, he's going to Alton Park, with his own kind,' which is an inner-city projects here in the city." (J.A. at 144.)

Plaintiff testified that the harassment upset him and alienated him, thereby interfering with his family life. Johnson corroborated the effects on Goodwin, stating that the harassment had altered his previously pleasant demeanor.

23

Before assessing the merits of Goodwin's claim, a procedural question must be addressed. Goodwin's grievance was filed in March of 2000. While Defendant does not contest that the grievance was filed within the appropriate time period as to more recent charges of alleged harassment,[8] Defendant argues that the grievance filing date precludes consideration of the incidents from 1993 and 1994. Defendant's argument lacks merit; prior acts (outside of the statutory time period) may be considered in evaluating a harassment claim. *AMTRAK v. Morgan*, 536 U.S. 101, 117 (2002) ("It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.").

Under the totality of the circumstances inquiry, the harassment experienced by Plaintiff was pervasive. Overall, there was trial testimony as to at least six forms of harassment: (1) Althoff striking Thomas, while emitting slurs; (2) closely supervised rides by Burtnett, which were directed disproportionately at black employees; (3) Burtnett's "screaming at" Plaintiff to roll down his sleeves, when white employees were allowed to wear their shirts with their sleeves up; (4) the daily employee meetings with closer supervision of African-Americans than white employees; (5) a manager, Milligan, commenting that the injured Goodwin would have "a slim Christmas," while Milligan was collecting money for injured white drivers; and (6) a manager, Clements, making comments that Plaintiff's assignment would put him "with his own kind." But there were far more

---

[8]*AMTRAK v. Morgan*, 536 U.S. 101, 122 (2002) ("a Title VII plaintiff raising claims of discrete discriminatory or retaliatory acts must file his charge within the appropriate time period -- 180 or 300 days -- set forth in 42 U.S.C. § 2000e-5(e)(1).").

than six instances of alleged harassment, taking into account the restrictive supervision that occurred each morning, at the daily employee meetings.[9]

Overall, there was sufficient evidence to harassment to support Plaintiff's claim. Due in part to the daily restrictions, the frequency of the harassment was great. As stated in the analysis of Plaintiff Johnson's claim, the Althoff incident created a threatening work environment. Burtnett's screaming would have been intimidating to a reasonable person. Other incidents, such as the "slim Christmas" comment, were humiliating. There was hostility in the closer discipline at the morning meetings, and the "his own kind" comment. Under the totality of the circumstances, there was sufficient evidence such that it would have been reasonable for a jury to find that Plaintiff Goodwin experienced a racially hostile work environment.

The district court erred in granting judgment as a matter of law to Defendant on the claims of racial harassment of both Plaintiff Johnson and Plaintiff Goodwin.

## CONCLUSION

For the aforementioned reasons, we **AFFIRM** the district court's grant of judgment as a matter of law as to Plaintiffs' disparate treatment claims, and we **REVERSE** the district court's judgment and **REMAND** for a new trial on Plaintiffs' hostile work environment claims under Title VII and the Tennessee Human Rights Act.

---

[9]The dissent mischaracterizes Plaintiff Goodwin's evidence of harassment, claiming that Goodwin offers two "minor" complaints relating to white employees horsing around and being allowed to roll their sleeves up. This clearly ignores the amount of evidence Goodwin offered, as well as the severity of the mentioned incidents. By discounting or failing to acknowledge Goodwin's evidence, the dissent incorrectly argues that Goodwin is merely attempting to "piggyback" on Johnson's claim. However as we have noted, Goodwin presented testimony on at least six different incidents of pervasive harassment.

No. 03-5620

**RONALD LEE GILMAN, Circuit Judge.** I concur in Part I of the majority opinion regarding Johnson's and Goodwin's disparate treatment claims. But I disagree with the majority's conclusion in Part II that the district court erred in granting judgment as a matter of law to UPS on Johnson's and Goodwin's claims of racial harassment.

Johnson cites seven occurrences to support his claim of racial harassment: (1) Todd's alleged use of the word "nigger" in an unknown context, (2) Todd's mimicking the way African-Americans speak, (3) Burtnett's references to someone "hauling" Johnson around, (4) Burtnett's admonishment of Johnson regarding "stealing time," (5) the failure of the UPS management to respond to Johnson's complaints, (6) Burtnett's request that Johnson remove his sunglasses, and (7) Burtnett's request that Johnson not move his name on the work assignment board.

All of the allegedly offensive actions on Burtnett's part are facially neutral from a racial viewpoint. Johnson has not demonstrated, for example, that he was asked to remove his sunglasses because of race. I therefore find it difficult to conclude, without additional evidence, that Burtnett's actions were motivated by racism. Conduct composed primarily of race-neutral disputes relating to discipline, work assignments, training, and other work-related issues does not rise to the level of an actionable hostile work environment. *Cf. Bowman v. Shawnee State Univ.*, 220 F.3d 456 (6th Cir. 2000) (holding that certain offensive acts could not be considered in the hostile-environment analysis because the plaintiff did not show that the harassment had an anti-male bias).

As for Todd's actions, which *were* racially based, I find it equally hard to conclude that the conduct alleged was so "severe and pervasive" as to "unreasonably interfere[] with [Johnson's] work performance." *Harris. v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). According to the Supreme

26

Court, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal citations omitted).

The majority makes much of Todd's isolated and unexplained use of the word "nigger" to a third party, but the cases it relies on to support the significance of this racial slur are readily distinguishable. In *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103 (9th Cir. 2004), for example, the plaintiff was subjected to extreme verbal insults, racist graffiti, an inability to collect overtime pay, and his supervisor's refusal to ensure that his vehicle received necessary maintenance, which ultimately resulted in a serious automobile accident. Likewise, in *Spriggs v. Diamond Auto Glass*, 242 F.3d 179 (4th Cir. 2001), the plaintiff was directly exposed to his supervisor's highly offensive racist comments on a daily basis.

The totality of the alleged conduct here, while certainly unwelcome and offensive, occurred only a few times over a period spanning several years. Johnson has therefore failed to show that Todd's purported actions were common or ongoing. This court has held that conduct far more severe and pervasive than that alleged by Johnson is not sufficient to create a hostile work environment. In *Smith v. Leggett Wire Co.,* 220 F.3d 752 (6th Cir. 2000), for example, the plaintiff testified that his coworkers and supervisors regularly made racially discriminatory comments and racially-motivated threats in his presence and circulated a crass cartoon captioned "How a Black Man Commits Suicide" around the plant. Yet this court reversed the jury's verdict for the plaintiff, holding that the conduct was "simply not 'severe or pervasive enough' to create an objectively hostile work environment." *Id.* at 760. If the conduct at issue in *Smith* did not rise to the level of

racial harassment, then Todd's actions here also fall short of this standard. *Cf. Burnett v. Tyco Corp.*, 203 F.3d 980 (6th Cir. 2000) (holding that three allegations of sexual harassment, although offensive, did not give rise to a genuine issue of material fact regarding whether the conduct was sufficiently pervasive to create a hostile work environment because they occurred over a six-month period of time).

As for Goodwin's racial harassment claim, it is essentially an attempt to piggyback on Johnson's claim. But Goodwin was not even aware of the incidents in question at the time they occurred. These incidents are therefore not relevant to his claim of racial harassment. *Cf. Abeita v. Transamerica Mailings, Inc.*, 159 F.3d 246, 249 n.4 (6th Cir. 1998) (noting that testimony showing that a company president had made comments outside of the plaintiff's presence was irrelevant to the plaintiff's claims because she was unaware of the comments at the time).

Goodwin also complains that white employees were allowed to horse around, but that black employees were not, and that he was required to roll his sleeves down while white employees were not required to do so. These minor complaints, however, simply do not rise to the level of workplace harassment based on race as mandated by *Harris v. Forklift Systems., Inc.* 510 U.S. 17, 21 (1993) ("When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated.") (internal citations omitted).

Accordingly, I would **AFFIRM** the decision of the district court.