*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 05a0171p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

SCOTTS COMPANY,

> *Plaintiff-Appellee/*
> *Cross-Appellant,*

*v.*

CENTRAL GARDEN & PET COMPANY,

> *Defendant-Appellant/*
> *Cross-Appellee.*

Nos. 03-4386/4452

---

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 00-00755—Edmund A. Sargus, Jr., District Judge.

Argued: March 11, 2005

Decided and Filed: April 12, 2005

Before: MARTIN and GILMAN, Circuit Judges; COHN, District Judge.[*]

---

## COUNSEL

**ARGUED:** John P. Gilligan, SCHOTTENSTEIN, ZOX & DUNN, Columbus, Ohio, for Appellant. David S. Cupps, VORYS, SATER, SEYMOUR & PEASE, Columbus, Ohio, for Appellee. **ON BRIEF:** John P. Gilligan, Daniel M. Anderson, SCHOTTENSTEIN, ZOX & DUNN, Columbus, Ohio, George A. Yuhas, ORRICK, HERRINGTON & SUTCLIFFE, San Francisco, California, for Appellant. David S. Cupps, William J. Pohlman, VORYS, SATER, SEYMOUR & PEASE, Columbus, Ohio, for Appellee.

---

## OPINION

---

RONALD LEE GILMAN, Circuit Judge. This complex commercial case presents a Gordian knot of issues arising from multiple, interrelated contract disputes between the Scotts Company, a manufacturer of lawn and garden products, and Central Garden & Pet Company, a distributor of lawn and garden products. In June of 2000, Scotts brought suit against Central, alleging that Central owed Scotts $23.8 million on accounts arising from multiple transactions in which Central

---

[*]The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

distributed lawn and garden-care products for Scotts.  Central responded with a counterclaim that alleged 11 separate causes of action relating to these transactions, and sought $976 million in damages.  The majority of the issues to be resolved on appeal pertain to Central's counterclaims.

In a series of partial judgments, including the dismissal of Central's contract and promissory-estoppel claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the granting of summary judgment against Central on its fraud claim, and the dismissal during trial of Central's inventory-return claim, the district court limited or dismissed the majority of Central's claims before they reached the jury.  The jury rendered verdicts of $22.5 million in favor of Scotts and $12.075 million in favor of Central.  A portion of the jury's verdict relating to incentive compensation was later stricken by the district court pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, reducing Central's award by $750,000.  In a further string of rulings, the district court set the rates of prejudgment and postjudgment interest, and determined that the transition from the former to the latter occurred when the jury's verdict was entered by the court as a judgment on May 16, 2002.

Central appeals the entire series of judgments against it, ranging from the Rule 12(b)(6) determinations to the award of prejudgment interest to Scotts.  Scotts's cross-appeal raises several issues involving the court's calculation of prejudgment and postjudgment interest, and contests the court's denial of attorney fees.  For the reasons set forth below, we **AFFIRM** in part and **REVERSE** in part the final judgment of the district court, and **REMAND** for further proceedings consistent with this opinion.

## I.  BACKGROUND

### A.   Factual background

#### 1.   *Central's breach-of-contract, promissory-estoppel, and fraudulent-misrepresentation claims*

From July of 1995 until October of 1999, Central was party to an Exclusive Agency and Distributor Agreement (referred to by the parties as the Alliance Agreement) with a division of the Monsanto Company called the Solaris Group.  The Alliance Agreement allowed Central to act as the exclusive distributor of the Solaris Group's Ortho and RoundUp garden products.  In its counterclaim to Scotts's lawsuit, Central alleged that Monsanto began exploring the sale of the Solaris Group in 1998, and that both Scotts and Central began independently negotiating for the purchase.

Central claimed that William Brown, its Chairman and CEO, and Glenn Novotny, its President, traveled to Scotts's corporate headquarters in Marysville, Ohio in April of 1998 to negotiate the purchase of the Solaris-owned brands.  According to Central, "the parties reached a meeting of the minds and formed an agreement relating to the Solaris Group's sale of its Ortho and RoundUp product lines."  This so-called "Acquisition Sharing Agreement" allegedly provided that, if either Scotts or Central was successful in purchasing the Solaris Group, the benefits and liabilities of the new entity would be split between them.  The specific percentages that each company would have of each brand would depend on which company succeeded in purchasing the Solaris Group.

Although the benefits and liabilities created by this purported agreement potentially involved millions of dollars, it was never reduced to writing.  Instead, it was allegedly an oral agreement, with the particulars "memorialized by the parties on a series of enlarged pages which were part of an easel display."  Central claimed that it had requested copies of these pages during discovery, but that they were never produced.

In August of 1998, Scotts reached a tentative agreement with Monsanto to integrate its business with the Solaris Group's product line.  Specifically, Scotts would acquire the Ortho line

and would be Monsanto's partner in the sales and marketing of RoundUp. Central claims that, when it reminded Scotts of the purported Acquisition Sharing Agreement, Scotts refused to comply on the ground that the deal Scotts had reached with Monsanto was different from the one contemplated by the parties during their prior discussions.

As part of Scotts's deal with Monsanto, Scotts acquired all of the rights that Monsanto had under the Alliance Agreement with Central. The Alliance Agreement came to an end in September of 1999. Central's counterclaim alleged that the failure of Scotts to comply with the Acquisition Sharing Agreement constituted a breach of the oral contract, that Scotts's statements at the April 1998 meeting were fraudulent misrepresentations, and that the doctrine of promissory estoppel required Scotts to comply with the Acquisition Sharing Agreement.

### 2.   *Central's inventory-return claims*

Although the Alliance Agreement terminated at the end of September of 1999, Central continued to distribute Scotts's products in the period between October 1, 1999 and September 30, 2000 ("Program Year 2000"). According to Central, the distribution was allegedly regulated by an "Oral Agency Agreement," under which

> the parties agreed that Central would serve as Scotts'[s] distribution agent for certain customers and certain products during the 2000 Program Year . . . . Scotts agreed to pay Central agency compensation in exchange for Central's distribution and delivery of Scotts'[s] products to customers during the 2000 Program Year.

Central claimed that, during Program Year 2000, it had accumulated an excess inventory of Scotts's lawn, garden, and horticulture products, as well as Ortho and RoundUp products. According to Central, the Oral Agency Agreement gave it two options with regard to the excess inventory: (1) Central could return the inventory to Scotts and get a refund, or (2) it could keep the inventory for distribution the following year. The district court correctly found that the second option "was not feasible since Scotts had notified Central that it would not enter into any future distribution agreement at the end of Program Year 2000." Central claims that it attempted to return the inventory, but that Scotts refused.

In its counterclaim, Central contended that Scotts had breached the Oral Agency Agreement by refusing to take back the Scotts, Ortho, and RoundUp inventory. But Central did not formally tender this excess inventory back to Scotts until the filing of its counterclaim.

Central also contends that it had attempted to return certain Miracle Gro products to Scotts during Program Year 1999. This claim was treated separately from the Program Year 2000 claims.

### 3.   *The incentive-compensation award*

The jury's verdict included an award of $750,000 to Central for Scotts's purported breach of contract with regard to an incentive program. This claim derived from an incentive program for sales of Ortho and RoundUp products to distributors such as Central titled "2000 Distributor Buy/Sell Trade Program." The program, which applied to sales made in Program Year 2000, set out three separate incentives for sales made by distributors in that time frame. Although it contained a caveat that the incentive program "should not be interpreted as an across-the-board price reduction," the effect of the incentive program was to reduce the price that distributors paid for Ortho and RoundUp products that they timely sold. The amount of an award for Scotts's violation of this agreement would therefore depend on the amount of Central's sales of Ortho and RoundUp products during Program Year 2000.

One of Scotts's witnesses testified that Central had not given Scotts any sales information for Program Year 2000. According to the district court, "the only evidence pertaining to Central's buy/sell sales for PY 2000 was a conclusory statement by Mr. Brown that he believed Central's sales were 'about $15 million.'"

**B.      Procedural background (including prejudgment and postjudgment interest issues)**

### 1.      *Central's breach-of-contract, promissory-estoppel, and fraudulent-misrepresentation claims*

Through a series of partial judgments, the district court addressed the claims discussed above, as well as the subsequent disputes over prejudgment interest, postjudgment interest, and attorney fees. In January of 2002, the court ruled on a motion by Scotts to dismiss the breach-of-contract, promissory-estoppel, and fraudulent-misrepresentation claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure. It held that, "even assuming as true the terms of the 'Acquisition Sharing Agreement' as pled by Defendant Central Garden, no enforceable obligation resulted." For that reason, it dismissed the breach-of-contract claim and the promissory-estoppel claim. Because Central pled its fraudulent-misrepresentation claim with greater specificity, the court held that this claim could not be resolved at the Rule 12(b)(6) stage.

Scotts later moved for partial summary judgment on the fraudulent-misrepresentation claim. The district court granted the motion in April of 2002, holding that the evidence presented by Central "d[id] not give rise to a genuine issue of material fact on the alleged falsity of the representation to enter into a joint venture on the Solaris line with Central."

### 2.      *Central's inventory-return claims*

After the close of Central's case-in-chief, Scotts moved for judgment as a matter of law on the inventory-return claims. Noting that Central had waited seven months after the end of Program Year 2000 before attempting to return the excess inventory, and that Central had sold at least a portion of the inventory without giving notice to Scotts, the district court granted Scotts's motion with respect to the Program Year 2000 inventory. Central's claim based on the Miracle Gro products left over from Program Year 1999 was initially allowed to proceed to the jury because Central was still in possession of the inventory, but the claim was subsequently dismissed in part because Central had failed to give seasonable notice with regard to some of the Miracle Gro products.

### 3.      *The jury's verdict*

In May of 2002, the jury returned a verdict in favor of Scotts for $22.5 million and a verdict in favor of Central for $12.075 million. The former was based entirely on Scotts's original breach-of-contract claim, but the latter was based on four separate awards: (1) $7,700,000 for breach of contract for the payment of agency fees, (2) $3,275,000 for excess shipments, (3) $750,000 for breach of contract on the incentive-compensation issue, and (4) $350,000 for the Miracle Gro products from Program Year 1999 that were subject to return.

### 4.      *The incentive-compensation award*

After the jury verdict was entered, Scotts filed a motion pursuant to Rule 59(e) of the Federal Rules of Civil Procedure to alter the verdict with regard to the $750,000 incentive award. Because of the lack of evidence as to Central's actual sales for Program Year 2000, the district court set aside this portion of the jury verdict.

### 5.      *Prejudgment interest and attorney fees (Scotts)*

Scotts also moved to amend the verdict to add prejudgment interest on its breach-of-contract claims for Program Year 2000, and sought attorney fees. The prejudgment-interest claims involved past-due accounts from four business units: gardens, lawns, growing media/organics, and horticulture.

#### a.      *Gardens*

Scotts claimed that the allowance of prejudgment interest for the gardens business unit was controlled by specific language contained in the 2000 Distributor Price List. This language, appearing in a section titled "Terms" about halfway through the seven-page document, provided that "[a] service charge of 1½% per month will be added to the unpaid balance of past due accounts." Holding that the price list constituted a written contract between the parties, the district court ruled that the specified interest rate—which amounted to 18% per annum—would be the prejudgment-interest rate for the portion of the verdict arising from the gardens unit.

#### b.      *Lawns*

Although the price list governing the lawns business for Program Year 2000 was silent as to the interest rate for past-due accounts, Scotts argued that the court should look to "the service charges specified on each individual lawns invoice issued during Program Year 2000." A "Terms & Conditions" section appears on the reverse side of the sample invoice submitted by Scotts, and a section titled "CREDIT" specifies that "[a] monthly service charge of one and one-half percent (1½) or up to the maximum permitted by law if less, will be payable on any past due portions of the purchase price after the due date." Distinguishing a term on the back of an invoice from a term in the price list for future transactions, the district court held that the interest rate was unenforceable and that Scotts was limited to the statutory rate of 10% per annum on past-due lawns accounts.

#### c.      *Growing media/organics and horticulture*

The documents governing the growing media and horticulture business programs did not specify any interest rate for past-due accounts. Accordingly, the district court awarded Scotts the statutory interest rate on these balances due from Central.

#### d.      *Attorney fees*

The district court denied Scotts's motion for attorney fees. Noting that fee-shifting provisions on preprinted commercial contracts are generally held unenforceable by the Ohio courts, the district court found no reason to depart from the general rule.

### 6.      *Prejudgment interest (Central)*

Unlike Scotts's detailed request for prejudgment interest, Central simply moved for any prejudgment interest to which it might be entitled, without presenting a method for calculating the amount. The court directed the parties to confer as to the net amount of prejudgment interest that they owed each other. After doing so, they agreed "that $2,827,123.65 is the net amount of prejudgment interest that has accrued in favor of Plaintiff Scotts through May 16, 2002."

The district court also considered, and rejected, a request by Central for "$1,574,630.00 in additional prejudgment interest resulting from additional amounts allegedly due and owing to Central from Scotts for Ortho/RoundUp shipments made during [Program Year] 2000." These "additional amounts" were not part of the jury award, and were unrelated to any evidence that was put before the jury.

### 7.    *Transition between prejudgment and postjudgment interest*

The parties also disagreed as to the date through which prejudgment interest ran.  Central argued that it stopped at the date of entry of judgment on the jury verdict (May 16, 2002), whereas Scotts claimed that it accrued until a final appealable order was entered by the district court (September 22, 2003).  Holding without explanation that "there is only one judgment in this case—the Rule 54(b) judgment entered on May 16, 2002," the district court held that prejudgment interest would end, and postjudgment interest begin, on that date.

## II.  ANALYSIS

### A.    Standard of review

#### 1.    *Motions ruled upon before the jury verdict*

This court reviews de novo a district court's dismissal of a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir. 1998).  "A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993) (quotation marks omitted).

The district court's grant of summary judgment is also reviewed de novo. *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 629 (6th Cir. 2002).  Summary judgment is proper where there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  In considering a motion for summary judgment, the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

A district court's grant of judgment as a matter of law is also subject to a de novo standard of review.  *Monette v. AM-7-7 Baking Co.*, 929 F.2d 276, 280 (6th Cir. 1991).  We will uphold a grant of judgment as a matter of law only where "there is either a complete absence of proof on the issues or no controverted issues of fact upon which reasonable persons could differ."  *Id.*

#### 2.    *Motions ruled upon after the jury verdict*

"The grant or denial of a Rule 59(e) motion is within the informed discretion of the district court, reversible only for abuse."  *Huff v. Metro. Life Ins. Co.*, 675 F.2d 119, 122 (6th Cir. 1982).  A district court's decision regarding the award of attorney fees or costs is also reviewed under the abuse-of-discretion standard.  *Purtle v. Eldridge Auto Sales, Inc.*, 91 F.3d 797, 799 (6th Cir. 1996).  The same standard applies to appellate review of awards of prejudgment interest,  *Hoover v. Provident Life & Accident Ins. Co.*, 290 F.3d 801, 809 (6th Cir. 2002), and of postjudgment interest, *AT & T Co. v. United Computer Sys., Inc.*, 98 F.3d 1206, 1209 (9th Cir. 1996), but the latter are reviewed de novo when they raise an issue of statutory interpretation.  *Id.*

### B.    Dismissal of Central's contract and promissory-estoppel claims

As noted by the district court, the Acquisition Sharing Agreement allegedly entered into at Scotts's facility in Marysville, Ohio would have been governed by Ohio law. *See Bamerilease Capital Corp. v. Nearburg*, 958 F.2d 150, 152 (6th Cir. 1992) (holding that Ohio law requires that contracts be interpreted according to "the law of the place of the contract's making").  An enforceable contract in Ohio arises from a meeting of the minds, and "must . . . be specific as to its

essential terms, such as the identity of the parties to be bound, the subject matter of the contract, consideration, a quantity term, and a price term." *Alligood v. Proctor & Gamble Co.*, 594 N.E.2d 668, 669 (Ohio Ct. App. 1991).

The district court explained in detail that the alleged oral contract between Scotts and Central, with tentative terms vaguely sketched out on pieces of easel paper that were never introduced into evidence, "lacks specificity as to essential contract terms." For example, the percentages of "ownership interest" in RoundUp and Ortho products are meaningless because the term "ownership interest . . . is not . . . defined with sufficient specificity to allow the Court to enforce a contract without, in effect, making the agreement for the parties." The alleged agreement not only failed to define the very interest that it purported to allocate, but also made "no reference . . . to a myriad of basic financial issues." Even if the district court's observation that the oral agreement would have violated Ohio's Statute of Frauds were not correct, an agreement lacking terms specific enough to be enforced falls short of the Ohio standard for a valid contract. *Alligood*, 594 N.E.2d at 669.

Likewise, a promise to abide by vague provisions like those contained in the alleged Acquisition Sharing Agreement could neither be "clear and unambiguous in its terms" nor induce "reasonable and foreseeable" reliance, two of the three requirements for promissory estoppel in Ohio. *See Cohen & Co. v. Messina*, 492 N.E.2d 867, 872 (Ohio Ct. App. 1985) (listing the elements of a claim for promissory estoppel). We therefore affirm the dismissal of Central's contract and promissory-estoppel claims for the reasons stated by the district court at pages 8-12 and 14 of its January 11, 2002 opinion.

**C.     Summary judgment as to Central's fraudulent-misrepresentation claim**

A claim of fraudulent misrepresentation in Ohio requires proof of

(a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance.

*Williams v. Aetna Fin. Co.*, 700 N.E.2d 859, 868 (Ohio 1998) (citation and quotation marks omitted). As the district court's detailed examination of the evidence makes clear, Central presented no evidence that Scotts intentionally made misleading statements. Furthermore, even if this analysis were flawed, the district court correctly observed that "*neither* Central nor Scotts acquired the Solaris line, which was the only basis on which Scotts and Central had discussions for a joint venture." (Emphasis by underlining in the original.) Because the conditions upon which the alleged promise was based never came to pass, Central could not have reasonably relied on the promise or suffered any related harm. We therefore affirm the grant of summary judgment on the fraudulent-misrepresentation claim for the reasons stated by the district court at pages 9-13 of its April 4, 2002 opinion.

**D.     Dismissal of Central's inventory claims**

The Ohio Uniform Commercial Code's provision invoked by Central in support of its inventory claims provides that "[u]nder a sale or return[,] unless otherwise agreed[,] . . . the option to return extends to the whole or any commercial unit of the goods while in substantially their original condition, but must be exercised seasonably . . . ." Ohio Rev. Code § 1302.40(B)(1). A buyer cannot claim the right to return goods after acting in a manner inconsistent with that right. *See Willoway Nurseries v. Curdes*, No. 98CA007109, 1999 WL 820784, at *5 (Ohio Ct. App. Oct.

13, 1999) (unpublished) ("[T]he buyer may not convert the goods to his or her own use and then assert that the goods were not accepted.")

Central's sale of at least part of the inventory and its failure to exercise its right until seven months after the end of Program Year 2000 were correctly identified by the district court as behavior inconsistent with the exercise of the right to return the inventory. Specifically, there was no way to determine whether the inventory was in "substantially [its] original condition" because part of the inventory was sold, and a delay of seven months is far from a "seasonabl[e]" exercise of the right of return. *See* Ohio Rev. Code § 1302.40(B)(1). Central's claims regarding its Miracle Gro inventory present a closer case, because Central returned a portion of the Miracle Gro inventory in a timely manner. The district court properly found that Central had failed to act seasonably with regard to the Program Year 2000 Miracle-Gro inventory, as opposed to the Miracle Gro inventory for Program Year 1999. *Id*. We therefore affirm the district court's action in dismissing the majority of Central's inventory claims for the reasons stated by the district court at pages 5-9 of its April 24, 2002 opinion, as well as from the bench on that same date.

## E.     The incentive-compensation award

The terms of the incentive-compensation program are set out in Scotts's Program Year 2000 term sheet for buy/sell sales of Ortho and RoundUp products. Under this program, which was divided into three separate incentives, the price paid by distributors like Central for Ortho and RoundUp products could be reduced if the distributors met certain sales goals. The percentage of the reduction, and the dollar amount that the distributor ultimately saved, depended on the sales figures that the distributor reported to Scotts.

The amount of Ortho and RoundUp products that Central sold during Program Year 2000 was never properly established. A Scotts representative testified that Central had not provided Scotts with any information about buy/sell sales for Program Year 2000. Central's CEO Brown claimed, however, without presenting any documentary evidence, that Central's sales were "about $15 million." The district court alludes in its March 20, 2003 opinion to further evidence suggesting that "the $35 million in Ortho/RoundUp product which Central held at the start of [Program Year] 2000 was used for agency sales," a type of sale not covered by the incentive program. But even without considering this additional evidence from Scotts, Central clearly failed to properly document a reliable sales figure of Ortho and RoundUp products for Program Year 2000. *Cf. Clay v. Ford Motor Co.*, 215 F.3d 663, 672 (6th Cir. 2000) (noting that "a district court must compare and weigh the opposing evidence and it must set aside the verdict if it determines that the verdict is against the clear weight of the evidence"). Because the formulation of an incentive-compensation award without a reasonably accurate sales figure is necessarily an exercise in arbitrariness, the district court did not abuse its discretion in setting aside this portion of the verdict in favor of Central.

## F.     Prejudgment interest (Scotts)

### a.     Gardens

Ohio law provides for a statutory prejudgment interest rate "unless a written contract provides a different rate of interest in relation to the money that becomes due and payable, in which case the creditor is entitled to interest at the rate provided in that contract." Ohio Rev. Code Ann. § 1343.03(A). Whether the district court was correct in setting the prejudgment interest rate on the gardens-unit accounts at 18% per annum depends on whether Scotts's 2000 Distributor Price List is considered a "written contract" under Ohio law. *See id.*

The leading case of *Hobart Brothers Co. v. Welding Supply Service, Inc.*, 486 N.E.2d 1229, 1232 (Ohio Ct. App. 1985), held that "a statement on an invoice or bill to which the other party has not assented does not meet the requirement of R.C. 1343.03(A) as to the existence of a written

contract between the parties." Other Ohio cases have applied this reasoning to invoices and similar documents. *See Yuhanick v. Cooper*, No. 99 CO 37, 2001 WL 274545, at *3 (Ohio Ct. App. Mar. 14, 2001) (unpublished) (applying *Hobart* to hold that an invoice did not constitute a written contract); *Cuff's, Inc. v. Clemmons*, No. 66913, 1994 WL 568320, at *2 (Ohio Ct. App. Oct. 13, 1994) (unpublished) (holding that an application to open a Shopper's Charge Account at a clothing store did not constitute a contract to pay increased interest, even after the customer made payments on the account at the higher interest rate).

One Ohio case allowed prejudgment interest to be based on a term contained in a price list, but only where a provision in a separate written contract signed by the parties explicitly incorporated the list. *See Alfa-Laval, Inc. v. Cow Supply, Inc.*, No. 3-88-18, 1990 WL 61743, at *6 (Ohio Ct. App. May 8, 1990) (unpublished) (using the interest rate set forth in the price list where a term in the governing contract provided that "Dealer's orders for De Laval Products will be sold to Dealer at the prices and terms as specified in De Laval Price Lists . . . ."). In the present case, there is no "governing contract" applicable to Scotts's Distributor Price List.

Although the district court properly noted that a price list is not the same as an invoice, Ohio case law strongly suggests that the district court erred by holding that a price list that had not been explicitly incorporated into a written contract was sufficient to meet the "written contract" requirement of § 1343.03(A). Central may have "order[ed] stock in response to the 2000 Distributor Price List," but it did not explicitly agree to the 18% interest rate. Furthermore, the fact that Scotts "sent this document to Central before any shipment occurred" is not controlling. Section 1343.03(A) makes no exception to the written-contract requirement in cases where the higher interest rate is buried in the fine print of an instrument other than a contract, even where the instrument is distributed before the goods are shipped.

Because this price list would almost certainly be found by an Ohio court not to constitute a written contract under § 1343.03(A), the district court erred in setting the prejudgment-interest rate of 18% per annum for the gardens unit. We therefore vacate this portion of the district court's opinion and hold that the correct prejudgment-interest rate is the Ohio statutory rate.

### b. *Lawns, growing media/organics, and horticulture*

The only documents setting an interest rate for the lawns unit were invoices. For the reasons discussed above, the district court properly held that these invoices did not meet the written-contract requirement of § 1343.03(A). Likewise, the statutory rate was appropriate for the growing media/organics and horticulture accounts, for which no written instrument at all specified a higher interest rate. We therefore affirm the district court's holding that the statutory-interest rate was appropriate for all of these other accounts.

## G. Attorney fees

As the district court correctly noted, this circuit has previously addressed the question of whether fee-shifting provisions like the one on which Scotts relies are enforceable under Ohio law. *See Colonel's, Inc. v. Cincinnati Milacron Mktg. Co.*, Nos. 96-1243, 96-1244, 1998 WL 321061, at *4 (6th Cir. June 1, 1998) (unpublished) (explaining, in a detailed discussion of Ohio law, that since 1841 "Ohio has followed the traditional rule that a stipulation by parties to a contract which permits attorney fees to be awarded as costs of collection upon default is void and against public policy"). Although several Ohio courts have carved out an exception where the provision is specifically negotiated for, *id.* at *5, that exception is not applicable to the facts of this case. We therefore hold that the district court did not abuse its discretion by denying Scotts's motion for attorney fees.

## H.      Prejudgment interest (Central)

Both parties appeal the district court's grant of prejudgment interest to Central, but neither party has convinced us that the district court abused its discretion regarding this issue. Scotts appeals on the ground that Central's motion for prejudgment interest, which was filed 19 days after the entry of judgment, was untimely as a Rule 59(e) motion. As the district court pointed out, however, Central's motion was not untimely under Rule 60(b)(6), which allows parties to seek relief for "any other reason justifying relief from the operation of the judgment." *Cf. Hopper v. Euclid Manor Nursing Home, Inc.*, 867 F.2d 291, 294 (6th Cir. 1989) (noting that "a motion made under Rule 60(b)(6) is addressed to the trial court's discretion"). A motion under Rule 60(b)(6) must be filed "within a reasonable time" after the judgment. Fed. R. Civ. P. 60(b)(6). This term is not defined for subsection (6), but it is defined for subsections (1), (2), and (3) as "not more than one year after judgment . . . was entered." Fed. R. Civ. P. 60(b). Given this open-ended time limitation under subsection (6), we hold that the district court did not abuse its discretion by accepting a motion filed 19 days after the entry of judgment.

Central, on the other hand, claims that it is entitled to $1,574,630 in additional prejudgment interest on amounts allegedly owed by Scotts. As the district court correctly pointed out, however, the additional amounts claimed by Central were not presented to the jury and were "not part of the judgment issued in this case." We therefore hold that the district court's rejection of Central's claim for additional interest was not an abuse of discretion.

## I.      The dividing line between prejudgment and postjudgment interest

Under 28 U.S.C. § 1961(a), which controls postjudgment interest in civil cases decided in the federal district courts, postjudgment "interest shall be calculated from the date of the entry of the judgment." The Supreme Court has interpreted this statute to require interest to run from the date of the entry of judgment by the court rather than from the date of the jury verdict. *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835 (1990). This circuit has held that postjudgment interest can run "from the date of any judgment that is not entirely set aside." *Skalka v. Fernald Envtl. Restoration Mgmt. Corp.*, 178 F.3d 414, 429 (6th Cir. 1999).

As the district court noted, the Ninth Circuit addressed an issue similar to the one that faces us here and held that postjudgment interest should accrue from the date of the final judgment. *See AT & T Co. v. United Computer Systems, Inc.*, 98 F.3d 1206, 1211 (9th Cir. 1996) (calculating postjudgment interest from the later of two possible dates of judgment, where the prejudgment interest was higher than the postjudgment interest, on the ground that "[w]here a prior judgment awarding damages has been vacated pursuant to the actions of an ultimately losing party, equitable principles favor calculating the interest in a manner that more fully compensates the prevailing party"). The district court attempted to distinguish *AT&T* by stating that "there is only one judgment in this case—the Rule 54(b) judgment entered on May 16, 2002."

This is incorrect. At least two judgments were entered after May 16, 2002, including a September 30, 2002 amended judgment and a September 22, 2003 final amended judgment. Several judgments were also entered before the jury verdict, but those judgments are not candidates for the date that postjudgment interest begins because the damages due were not sufficiently ascertained. *Cf. AT&T*, 98 F.3d at 1210.

The justification given by the Ninth Circuit for calculating postjudgment interest from the date of final judgment applies with equal force in the present case. Although both parties received jury awards, Scotts was clearly the "prevailing party." *Id*. at 1211. Scotts was awarded $22.5 million of its $23.8 million claim; Central was awarded only $12.075 million of the originally requested sum of $976 million (and this award was further reduced by the district court). Because

the prejudgment-interest rate on all of the claims is substantially higher than the postjudgment-interest rate, the district court's decision to start postjudgment interest from the May 16, 2002 judgment on the jury verdict grants an unjustified benefit to Central as the losing party. This equitable imbalance could have been avoided if the district court had ruled that postjudgment interest did not begin until the September 22, 2003 final amended judgment. We therefore reverse the district court's ruling on this issue, and set the date at which postjudgment interest begins to run at September 22, 2003.

## III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** in part and **REVERSE** in part the judgment of the district court, and **REMAND** for further proceedings consistent with this opinion.