NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0123n.06
Filed: February 15, 2006

No. 05-5325

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

KELLY   KILGORE   HALVORSEN,  )
Individually and as Personal Representative of  )
the Estate of Bruce Halvorsen, Deceased  )
 )
     Plaintiff-Appellant,  )  ON   APPEAL   FROM   THE   UNITED
 )  STATES   DISTRICT   COURT   FOR   THE
v.  )  EASTERN DISTRICT OF TENNESSEE
 )
PLATO LEARNING, INCORPORATED,  )
 )
     Defendant-Appellee.  )

Before:  SILER, SUTTON and COOK, Circuit Judges.

SUTTON, Circuit Judge.  Bruce Halvorsen and his wife Kelly Kilgore Halvorsen worked for competing educational-technology companies:  Bruce for Plato Learning, Inc., and Kelly for Riverdeep Interactive Learning.  Kelly rebuffed Plato's offers of employment; Plato ultimately ended Bruce's employment.  Three weeks after Plato fired Bruce, he died in a single-car accident.  Kelly asserts that Plato's decision to fire her husband was "specially designed (a) to punish the Halvorsen family for [her] refusal to work for Plato; and (b) in some backhanded way to induce her to return to work for [Plato] even in the face of" the firing.  Halvorsen Br. at 27.  Because the circumstances of Bruce's employment, firing and death do not support any of the claims asserted against Plato as a matter of law, we affirm the district court's grant of summary judgment.

I.

In 1992, Bruce Halvorsen began working for Plato (then called TRO Learning) as a technical-support engineer in its corporate office in Minnesota. In 1997, Plato hired Kelly Kilgore as an educational consultant and permitted her to work out of her home in Knoxville, Tennessee.

In December 1997, Bruce and Kelly met at a company event, and they married shortly thereafter in June 1998. Bruce relocated in 1998 to Tennessee, where he worked as a field engineer for Plato. In 1999, Kelly became a sales account manager for Plato. Although they both worked out of offices in their home, the Halvorsens' job duties did not overlap, they worked on different projects for Plato and they maintained separate, individually protected computers.

Kelly left Plato in 2000 to work as a sales representative for a competitor, Riverdeep, where she had considerable success, earning as much as $330,000 in one year in salary and commissions. In 2001, Plato filed a lawsuit against Kelly and Riverdeep, alleging breach of a non-solicitation and confidentiality agreement between Kelly and her former company. The parties settled the dispute for $50,000.

Once the litigation had ended, Plato made several attempts to rehire Kelly. After she rejected a written offer of employment in January 2002, *see* JA 181, she claims that "it got nasty," JA 1248. In a conversation with Plato vice-president Mike Reynolds, Kelly claims that he threatened to fire her husband if she did not agree to return to Plato. When Reynolds asked her to work for Plato, she told him, "I want to stay where I am," to which he replied, "Well, does Bruce like his job?"

JA 1249. When Kelly answered, "Yes, I believe he does," Reynolds responded, "Would Bruce like to keep his job?" *Id.* According to Kelly, she said, "I hear what you're saying," ended the conversation and rejected Plato's offer. *Id.*

Four months later, in May 2002, Riverdeep and Plato competed for a sale. Riverdeep was awarded the contract for $250,000; Plato had put in a bid for $500,000. Four days after learning they had lost the sale, Plato fired Bruce. Kelly claims that Bruce told her he was fired "[b]ecause you turned down the job that Plato offered you." JA 1247. On May 28, 2002, Plato explained its decision through an internal e-mail to company employees:

> The competitive environment has changed over the last year. Because of this, we are running head to head with certain companies on major deals. As many of you know, Bruce Halvorsen's wife, Kelly, is a top salesperson for one of these companies, Riverdeep. For this reason, Bruce Halvorsen is leaving the organization and transitioning to other employment opportunities effective at the close of business today. This is not in any way the result of Bruce's performance with PLATO and in no way suggests any impropriety has occurred.

JA 1373.

After Plato discharged Bruce, Kelly claims that he was "despondent." JA 279. On June 10, 2002, three weeks after the firing, Bruce and a friend stayed up late "talking because he could not sleep [and] was nervous, appeared depressed, and worried about his financial situation with his children." JA 290. Around 12:30 a.m. on June 11, Bruce left to get cigarettes. He died in a single-car accident on "a very curvy road" with "no shoulders" that experiences "lots of accidents." JA 159. The Tennessee Department of Transportation ruled Bruce's death an accident; it "believed that

[Bruce] was dodging something, because he tried to recover the car, either an animal or he just went off the shoulder . . . the marks indicated that he broke back right and then couldn't recover." *Id.*

Kelly found it "emotionally impossible to continue working or to bring in any new clients" after her husband's death. Halvorsen Br. at 18 (internal quotation marks omitted). About two years later, she quit her job at Riverdeep.

In 2002, Kelly filed a complaint in Tennessee state court against Plato on behalf of herself and the estate of her husband. After Plato timely removed the case to federal court, the parties consented to have the case handled by a magistrate judge. On February 15, 2005, the magistrate judge granted Plato's motion for summary judgment.

## II.

On appeal, Kelly argues that the magistrate judge improperly rejected several contract and tort claims as a matter of law and contends that the magistrate judge abused his discretion in excluding the proposed expert testimony of one of her witnesses. We give fresh review to a district court's summary-judgment decision, *Scotts Co. v. Cent. Garden & Pet Co.*, 403 F.3d 781, 787–88 (6th Cir. 2005), and give abuse-of-discretion review to a decision to exclude expert testimony, *Barnes v. Kerr Corp.*, 418 F.3d 583, 588 (6th Cir. 2005). Tennessee law, the parties agree, governs these claims.

A.

The trial court dismissed the breach-of-employment-contract claim against Plato because Bruce was an at-will employee. *See Cantrell v. Knox County Bd. of Educ.*, 53 S.W.3d 659, 662 (Tenn. 2001) ("[I]n the absence of . . . a contract of employment for a definite term," Tennessee law provides that "an employment relationship generally can be terminated by either the employer or the employee with or without cause."). In response, Kelly argues that Bruce was not an at-will employee because Plato "induce[d]" him "to give up his long-standing position in Minnesota in order to move to Tennessee" with a "promise of long employment." Halvorsen Br. at 43 (internal quotation marks omitted). The record does not support this claim.

All written correspondence between Plato and Bruce indicates that he was employed at will. His offer of employment stated that he would be an at-will employee. JA 195 ("[Y]our acceptance of this offer of 'at will' employment represents the sole agreement between you and [Plato]."). The employee handbook said the same thing. JA 1393 ("All employment at PLATO Learning is considered 'at will.' This means that an employee may at any time without reason, with or without notice, and without procedural formality or progressive discipline, be terminated from employment with the company."). And the employee manual made clear that his at-will status was not subject to change. *Id.* ("No practice or procedure and no representations to the contrary, written or oral, expressed or implied, . . . forms part of any employment contract between you and the company so as to alter the status of employment at will. No representative of the company shall have the

authority to enter into any employment agreement in contradiction with the employment at will except as authorized in writing by the President of PLATO Learning.").

Attempting to rebut this evidence, Kelly relies on her deposition testimony and her affidavit. While Kelly's statements show that Plato was pleased to have Bruce relocate to Tennessee, they also acknowledge that he was marrying someone who presently lived in Tennessee and are equally consistent with the view that Bruce's transfer accommodated his personal interests as much as the company's needs. While her appellate briefs repeatedly say that Plato promised to employ Bruce for a "long" time, that word does not appear on any of the appendix pages cited in support of this argument. *See* Halvorsen Br. at 7; Halvorsen Rep. Br. at 19.

In total, the record evidence supporting this claim consists of the following testimony by Kelly: Bruce "never had a concern that he would get fired," JA 1329; Plato "told him he was a valuable employee," JA 1327; he "certainly had to be reassured to leave Minnesota to work in the field, to work at home [because] [h]e'd always worked in the corporate office," *id.*; she and "everybody heard it . . . : 'If we could just get Bruce Halvorsen down there, he is the best, he's the one—you know, we won't have any technical problems[']," JA 1328; Bruce had "various awards pointing out his work ethic signed by officers of the company," *id.*; he "never believed that he would lose his job," JA 281; "the news of [his] termination came as a total shock," *id.*; Plato "did yearly contracts" and "presented" itself as an "equal opportunity employer[]," JA 1322–23; and employees "felt secure that if you did your job, you would not be fired," JA 1323.

All of this in the end amounts to nothing more than generalizations about Bruce being a good employee and his lack of subjective fear that he was at risk of being fired—both of which fall short of what Tennessee requires to alter an at-will relationship. As Kelly has pointed to no evidence of a definite term of employment (written or otherwise), the magistrate judge correctly determined that Bruce was an at-will employee and thus properly dismissed the breach-of-contract claim.

B.

Because Kelly bases her claim for promissory fraud on alleged promises of "long" employment, *see* Halvorsen Br. at 43, this claim fails as well. Nor, at any rate, has she alleged the facts necessary to support a prima facie case of promissory fraud—namely, that Plato made "an intentional misrepresentation with regard to a material fact" or had "knowledge of the representation['s] falsity." *Stacks v. Saunders*, 812 S.W.2d 587, 592 (Tenn. Ct. App. 1990) (citations omitted).

C.

The district court also properly rejected the retaliatory-discharge claim as a matter of law. "In Tennessee an employee-at-will generally may not be discharged for attempting to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy which is evidenced by an unambiguous constitutional, statutory, or regulatory provision." *Stein v. Davidson Hotel Co.*, 945 S.W.2d 714, 717 (Tenn. 1997). The magistrate judge characterized Kelly's claim as alleging that Plato violated a "public policy favoring marriage" by firing her husband.

Mag. Op. at 9. Finding no "clear and w[e]ll-defined public policy or clear mandate under Tennessee law opposing employment decisions based upon an employee's marriage to an employee of a competitor," *id.* at 10, the judge dismissed the claim.

Kelly contends that the magistrate judge took "much too narrow and inaccurate a view of the rights that were violated by Plato," explaining that "[i]t is not the fact that Mr. Halvorsen was fired because of his marital status that is offensive here; it is, rather, the fact he was terminated merely because of his relationship with an employee of a competitor, whatever the nature of that relationship." Halvorsen Br. at 28. But as she identifies no evidence of such a public policy in Tennessee or elsewhere, her claim cannot proceed.

Kelly also invokes a Tennessee statute banning restraint of trade as the basis of the public policy supporting the retaliatory-discharge claim. The statute provides:

> All arrangements, contracts, agreements, trusts, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in the importation or sale of articles imported into this state, or in the manufacture or sale of articles of domestic growth or of domestic raw material, and all arrangements, contracts, agreements, trusts, or combinations between persons or corporations designed, or which tend, to advance, reduce, or control the price or the cost to the producer or the consumer of any such product or article, are declared to be against public policy, unlawful, and void.

Tenn. Code Ann. § 47-25-101. In *Bloom v. Gen. Elec. Supply Co.*, 702 F. Supp. 1364 (M.D. Tenn. 1988), Kelly points out, a district court addressed a similar fact pattern—a couple worked as employees at will for the defendant and when the husband took a job with a competing company in

the area, the defendant terminated the wife, citing potential conflict of interest and antitrust concerns. And there, Kelly adds, the court concluded that § 47-25-101 embodies a public policy against restraint of trade and refused to dismiss a retaliatory-discharge claim as a matter of law.

Like the magistrate judge, we "respectively disagree[]" with the reasoning of *Bloom.* Mag. Op. at 11. No other Tennessee decision supports this reading of the statute, and no federal or state case has cited *Bloom* favorably for this proposition. Most importantly, the statute does not say that *any* action resulting in a restraint of trade violates the criminal law; it says that "arrangements, contracts, agreements, trusts, or combinations between persons or corporations" restraining trade will violate the law. Kelly has pointed to no such agreement involving Plato or anyone else. *See also Freeman Indus. LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 522 (Tenn. 2005) ("According to its plain language, the [statute] prohibits *arrangements* that decrease competition or affect the prices of goods.") (emphasis added). That Plato wished to "expand[] sales," as its 2002 annual report unsurprisingly said, JA 442, and that it recognized the "intensely competitive" nature of the educational-technology industry, JA 450, do not show that the company entered into an anti-competitive agreement, as this criminal law requires. Accordingly, whether framed as a claim directly under the statute or framed as a claim premised on a retaliatory discharge in violation of the public policy identified in the statute, the claim fails as a matter of law.

## D.

The trial court also properly dismissed the outrageous-conduct claim. To establish this tort,

"the conduct complained of" must be "intentional or reckless," must be "so outrageous that it is not tolerated by civilized society" and must "result in serious mental injury." *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). Kelly has not directed us to any cases in which the discharge of an at-will employee satisfied this standard.

Nor does the manner of the discharge satisfy this imposing standard. The uncontradicted evidence shows that Plato informed Bruce of its decision to fire him over the telephone and later sent an e-mail to its employees explaining its reasons for the decision and emphasizing that the choice did not rest on concerns about Bruce's performance or suggest that he had engaged in any impropriety. Neither did the company hide its motives for the discharge: its concerns about Kelly working for a competing company. While one can certainly imagine better ways to handle the problem that Plato faced, its solution cannot be described as conscience-shocking in a legal sense. And because Plato's action did not amount to outrageous conduct as a matter of law, we need not address Kelly's argument in support of her "indirect, bystander claim," including the impact of the decision in *John Doe 1 ex rel. Jane Doe 1 v. Roman Catholic Diocese*, 154 S.W.3d 22 (Tenn. 2005).

E.

Also unavailing is Kelly's claim that Plato interfered with her employment relationship with Riverdeep and caused her to breach her contract with it. To establish this claim, Kelly bore the burden of demonstrating: "(1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge

of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and finally, (5) damages resulting from the tortious interference." *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002) (internal quotation marks omitted).

Most problematically, Kelly cannot show that Plato proximately caused her to resign from her job. While Kelly eventually did resign from her job, she did not turn in her resignation until almost two years after the company fired her husband. *See Wooley v. Madison County*, 209 F. Supp. 2d 836, 849 (W.D. Tenn. 2002) (one element of a claim for procurement of a breach of contract is "that the act complained of was the proximate cause of the breach of the contract"). Making matters worse, she acknowledges that she has "an open-door policy to go back" to Riverdeep "whenever [she] can," JA 1214, which is fundamentally inconsistent with the claim that Plato caused her to leave Riverdeep.

F.

In pressing her wrongful-death claim, Kelly asserts that "[i]f Bruce hadn't been terminated in the way he was terminated, he wouldn't have been despondent. . . . He wouldn't have been nervous, he would have been able to sleep, he wouldn't have been worried, felt betrayed; and he would have been in Las Vegas with the other field engineers from Plato . . . [the] weekend [he died]." JA 160. This claim fails under fundamental tort-law principles. A claim of negligence

requires: "(1) a duty of care owed by the defendant to the plaintiff; (2) conduct falling below the applicable standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate, or legal cause." *Bradshaw v. Daniel*, 854 S.W.2d 865, 869 (Tenn. 1993). Because Plato employed Bruce at will, it had no duty to employ him permanently. And even if one could say that Plato's decision became one of many but-for causes of Bruce's death, its decision cannot plausibly be described as the *proximate* cause of his death. *See, e.g.*, *McClenahan v. Cooley*, 806 S.W.2d 767, 775 (Tenn. 1991) (holding proximate causation requires, among other things, that "the tortfeasor's conduct must have been a substantial factor in bringing about the harm being complained of" and that "the harm giving rise to the action could have reasonably been foreseen or anticipated by a person of ordinary intelligence and prudence") (internal quotation marks omitted). That "a person in Mr. Halvorsen's emotional state could well be expected to suffer an accident of the kind that killed him," Halvorsen Br. at 46, is no answer to this defect in the claim, because Kelly nowhere alleges that Plato knew or should have known of Bruce's emotional state, whether before or after the discharge.

## G.

Kelly, lastly, argues that the district court abused its discretion in rejecting expert evidence from Dr. Walker, who performed a "psychological autopsy" on her husband and who concluded that Plato's actions "led to his emotional condition and contributed to the auto accident." JA 288. The federal Rules of Evidence give trial judges responsibility for acting as gatekeepers over expert testimony. *See* Fed. R. Evid. 702; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). In this

instance, Dr. Walker explained that she neither spoke with nor examined Bruce, did not review any of his medical records, relied entirely on anecdotal evidence supplied by Kelly and admitted that she had never performed a psychological autopsy before. No less importantly, Kelly sought to use this testimony to establish an opinion about the *legal* cause of her husband's death. On this record, the magistrate judge did not abuse his considerable discretion in excluding "what amounted to a legal opinion" from an expert witness. *Stoler v. Penn Cent. Transp. Co.*, 583 F.2d 896, 899 (6th Cir. 1978); *see also Torres v. County of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985) ("The problem with testimony containing a legal conclusion is in conveying the witness' unexpressed, and perhaps erroneous, legal standards to the jury. This invades the province of the court to determine the applicable law and to instruct the jury as to that law.") (internal quotation marks omitted).

III.

For these reasons, we affirm.