NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0404n.06
Filed: June 14, 2006

No. 04-6314

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| CHARLOTTE FERGUSON, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE MIDDLE DISTRICT OF |
| | ) | TENNESSEE |
| JOHN W. SNOW,* Secretary of the Treasury | ) | |
| of the United States of America, in his | ) | OPINION |
| official capacity, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |
| ——————————————— | ) | |

Before: MOORE and McKEAGUE, Circuit Judges; and POLSTER, District Judge.**

POLSTER, District Judge. Plaintiff-Appellant Charlotte Ferguson ("Ferguson") appeals

from the judgment, in favor of the United States Secretary of the Treasury ("the Secretary"), on her

claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., ("Title VII"). On

appeal, Ferguson claims that the district court erred in granting the following motions by the

Secretary: (1) motion for summary judgment on Ferguson's hostile work environment and

harassment claims; (2) motion in limine to exclude evidence of the settlement of Ferguson's

---

*Pursuant to Federal Rule of Appellate Procedure 43(c)(2), John W. Snow has been substituted for Paul H. O'Neill as defendant-appellee in this action.

**The Honorable Dan Aaron Polster, United States District Judge for the Northern District of Ohio, sitting by designation.

administrative claims; and (3) motion for judgment as a matter of law on Ferguson's 1999 non-promotion claim. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. FACTS

Unless otherwise noted, the following facts are taken from Ferguson's complaint. Ferguson, an African-American, began working as a revenue agent with the Nashville District Office of the Internal Revenue Service ("IRS" or "Agency") in 1977. From 1977 to 1980, Ferguson received annual non-competitive promotions from grades GS-5 through GS-11. Promotions beyond GS-11 are considered competitive promotions. Beginning in 1981, Ferguson applied for GS-12 positions and requested numerous job assignments to enhance her promotional opportunities, including an assignment to the Quality Measurement Staff ("QMS"). However, Ferguson's requests for promotion and job assignments were consistently denied. Ferguson alleges that four white revenue agents who were hired at the same time and same level as she were rapidly promoted within the Nashville office, and received assignments which enhanced their promotional opportunities.

In March 1995, Ferguson was interviewed for a GS-12 position in the QMS but was not selected for the job. Ferguson was notified that she was not selected due to lack of QMS experience. However, argues Ferguson, a similarly situated white employee with no QMS experience was selected for the position. On March 6, 1995, Ferguson met with a counselor from the Equal Employment Opportunity Commission ("EEO"). One week later, she was given a 90-day assignment to QMS. On April 14, 1995, Ferguson filed her first EEO complaint alleging discrimination in the job promotion process based on the March 1995 non-promotion. In August 1995, Ferguson was promoted to a GS-12 position. Ferguson states that the promotion occurred a few days after IRS management received her EEO file.

2

The complaint alleges that in September 1996, Ferguson's manager Tim Reilly made a racist remark about black people while teaching an IRS class. Alison Broady, a black female employee of the IRS who was present at the training session, testified about this incident at a hearing on one of Ferguson's EEO complaints. Broady testified that one on the individuals attending the class asked Reilly a question about going out with agents on cases in the city of Pulaski, Tennessee. Reilly responded that the agents should just put on their hoods and capes and walk around like they belong. Broady complained about the remark to higher level managers in the agency. Ferguson alleges in her complaint that Reilly was instructed to apologize to Broady but did not do so. Broady testified that Reilly did not apologize to her directly, but made a statement to the class in general.

During her tenure with the IRS, Ferguson filed a total of six EEO complaints for race discrimination, retaliation and harassment based on her non-selections and low performance evaluations. In July 1997, Ferguson attended a hearing before an administrative law judge regarding her first and third EEO complaints. During that hearing, Ferguson entered into a settlement with the IRS pursuant to which the agency paid Ferguson the sum of $1400.00, an amount that represents a portion of the backpay she would have received had she prevailed on her claims against the agency. In addition, the agency agreed to detail Ferguson to a GS-12 position in the QMS for at least 18 but no more than 30 months, and not to discriminate or retaliate against Ferguson during that detail or at any other time. Furthermore, during her detail to QMS, Ferguson would be eligible for promotion on the same basis as any other employee.[1] Ferguson states that in late July she was contacted by a

---

[1]Most of these terms were reproduced in Ferguson's complaint. Any terms that were not explicitly stated in the complaint are taken from the actual settlement agreement which was attached to the Secretary's motion for summary judgment.

QMS employee who told her that white QMS employees did not want her to be assigned to QMS because she was a troublemaker and had previously filed union grievances and EEO complaints.

In August 1997, Ferguson was detailed to QMS. Her manager was Jackie Abraham, a black female, and the chief of QMS was Bobby Brown, a white male. In February 1998, Abraham gave Ferguson her annual appraisal. Ferguson claims she received the lowest rating a revenue agent had ever received in Nashville's QMS, and asserts that the appraisal was not based on her performance. Rather, she argues, the appraisal was given in retaliation for her earlier EEO activity and was racially discriminatory. Ferguson testified at trial that she refused to sign the evaluation until Abraham discussed it with Brown and Brown himself reviewed the evaluation. Ferguson testified that a meeting was subsequently held between Abraham, Brown and herself during which time she correctly pointed out that the critical elements listed on the job appraisal form pursuant to which she was to be evaluated were incorrect. To remedy the situation, Brown directed Abraham to speak with labor relations.

Abraham testified at trial that labor relations instructed her to start a new rating period because the February evaluation was invalid. Connie Watson, the labor relations specialist at the time, testified at trial that she advised Abraham to re-evaluate Ferguson's performance after observing her under the correct critical elements for a minimum of 60 days. Abraham testified that "because the [new] rating period was so short . . . [labor relations suggested] that I review a hundred percent of [Ferguson's] work so that I could get a snapshot of what had been done during that time in order to give [Ferguson] a fair evaluation." J.A. at 844 (Testimony of Jackie Abraham). Although Watson testified at trial that she did not recall telling Abraham to conduct a 100% review of Ferguson's work, she stated there would be no problem in conducting such a review.

4

The complaint alleges that in March 1998, Abraham told Ferguson that she was extending Ferguson's rating period for an additional 90 days during which she would conduct a 100% review of Ferguson's work. Ferguson testified at trial that Abraham sent her a memo stating that all completed work was to be submitted to Abraham before leaving QMS. Ferguson alleges in her complaint that no QMS employee had ever been subjected to a 100% review of his/her work, and states that the action constituted harassment, race discrimination, retaliation, and a breach of the July 1997 settlement agreement.

John Lee, who became the assistant chief of the examination division for the states of Kentucky and Tennessee in June 1998, testified at trial that the agency posted announcements for GS-12 and GS-13 vacancies in October 1998. Over 100 employees were promoted in the Kentucky/Tennessee district. Most of these promotions occurred in January and February of 1999. Between the two states, over forty employees were promoted to GS-13 positions. Ferguson testified at trial that an announcement was posted at this time regarding a promotional opportunity and conceded that she did not apply for the promotion.

Ferguson's final non-promotion claim arises from a situation that, according to Ferguson, occurred in August 1999. The complaint alleges that two GS-13 positions became available in the Nashville QMS. At this time, Ferguson claims she was the only GS-12 in the Nashville QMS eligible for a GS-13 position. The agency, however, transferred in two white female GS-13 revenue agents – Alice Childs and Amanda Polen – to fill the vacant positions instead of announcing the opportunities, in violation of IRS policy. The agency took this action, argues Ferguson, to deny her a promotional opportunity. As a result of this allegedly retaliatory and racially discriminatory action, Ferguson filed her sixth EEO complaint.

5

The Secretary disputes the facts underlying this non-promotion claim. The answer to the complaint states that Childs and Polen were not brought into QMS pursuant to any vacancies and were transferred into the department in compliance with the collective bargaining agreement between the agency and the union. Michael Rhoton, the chief of QMS at the time of these transfers, testified about this incident at trial. Rhoton explained that after the competitive promotions were filled in 1999, he submitted a request for additional staffing to John Lee (who at that time was chief of the examination division) because his department was overworked. In response to Rhoton's request, Lee offered Alice Childs. Childs was a GS-13 who requested a hardship transfer because her husband had been relocated to Nashville. Subsequently, Rhoton approached Lee with an additional staffing request. Lee offered Amanda Polen for this position. Polen was a full-time GS-13 who was pregnant (or recently gave birth) and requested part-time work to accommodate her situation. Rhoton testified that Lee had the discretion to take a hardship candidate or announce a new position.

Lee's trial testimony was slightly different. He testified that after the competitive selections were made in 1999, Rhoton approached him with a request for additional staff, specifically, a full-time GS-12. Lee, who was aware of Polen's need for accommodation and unsure what to do about it, offered Polen as a part-time GS-13. Rhoton accepted and both problems were resolved. Lee testified that Childs, however, was not brought into QMS pursuant to a request for additional staffing. Lee explained that each examination division had a staffing level, or ceiling, which it could not exceed. As long as he was within that level and had the funds to hire additional employees, Lee could bring in hardship candidates. Childs was a computer audit specialist who became available for a hardship transfer. Lee testified he did not have any competitive vacancies that he could

6

announce, but had the authority to place Childs into the QMS as long as he, as here, had the funding to support the additional position. Lee testified that Childs' availability presented him with an excellent opportunity to enhance his operations – no one in the QMS had equivalent computer skills – and he was not hurting any other employees by bringing her in because there were no vacancies available. Lee testified that but for the hardship, the position never would have been created. Lee also stated that his practice during his time as chief of the examination division was to allow hardship transfers to maintain the grade level they had from their prior position.

## II. PROCEDURAL HISTORY

In May 2001, Ferguson filed a complaint in the U.S. District Court for the Middle District of Tennessee, alleging that the IRS engaged in a continuing pattern of discrimination based on her race, starting in 1982, by failing to promote her at various times during her employment, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII"). Ferguson also alleged that the agency took numerous actions against her in retaliation for her prior EEO activity, and created a hostile work environment.

The Secretary filed a motion for summary judgment, alleging that Ferguson's claims of discrimination arising between 1982 and March 1995 were time-barred and the matters resolved by the parties' settlement agreement should be dismissed as moot. The district court granted the motion solely with respect to those claims arising before March 1995. The district court found that the claims arising between 1982 and March 1995 were time-barred because Ferguson did not initiate contact with an EEO counselor regarding any non-selection or denial of job opportunity that took place during this time. In addition, the court held that it lacked jurisdiction over the breach of settlement agreement claim which under the Tucker Act must be brought in the U.S. Court of

7

Federal Claims. The district court found insufficient evidence that Ferguson exhausted her remedies with respect to her first and third EEO complaints, but found that Ferguson exhausted her remedies with respect to her second, fourth, fifth and sixth EEO complaints. Accordingly, the court granted the motion for summary judgment, except as to Ferguson's Title VII claims arising under her fourth, fifth and sixth EEOC complaints.[2]

Shortly before the commencement of trial, the Secretary filed a motion in limine to exclude witnesses who had no personal knowledge of the events at issue in the case, to exclude evidence regarding EEO complaints filed prior to 1998, which claims were dismissed in the district court's order granting summary judgment, and to exclude evidence regarding the settlement agreement pursuant to Federal Rules of Evidence 401, 402 and 602. The following day, the district court held a final pretrial conference at which time defense counsel was given an opportunity to respond to the motion in limine in open court. After hearing argument, the district court granted the motion in limine with respect to the witnesses and to any evidence of the settlement agreement but otherwise denied the motion without prejudice. The district court stated that evidence on any settlement agreements should be excluded "because that would be taking up matters outside the Court's jurisdiction." J.A. at 892 (Tr. of Final Pretrial Conference).

In September 2004, the matter proceeded to trial. At the close of Ferguson's case-in-chief, the Secretary moved for judgment as a matter of law on all claims. The district court granted the motion with respect to Ferguson's 1999 non-promotion claim (which formed the basis for her sixth EEO complaint) but denied it with respect to her claims of retaliation. The district court found that

---

[2]It is unclear why the district court dismissed the claim arising from Ferguson's second EEO complaint. In any event, Ferguson does not raise this issue on appeal, and it should be considered abandoned and not reviewable on appeal. *United States v. Pugh,* 405 F.3d 390, 401 (6th Cir. 2005).

8

the two positions that were filled in 1999 were not actual promotions; rather, the agency laterally hired a pregnant employee who requested accommodation, and transferred in another employee pursuant to a hardship request. The district court concluded that Ferguson made no showing that either of those decisions was pretextual or unworthy of belief. The jury found in favor of the Secretary on Ferguson's remaining claims of retaliation.

## III. ANALYSIS

### A. Summary Judgment

We review a district court's grant of summary judgment de novo. *Spotts v. United States,* 429 F.3d 248, 250 (6th Cir. 2005). Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* (citing FED. R. CIV. P. 56(c)).

Summary judgment was proper in this case because Ferguson failed to exhaust her administrative remedies before filing suit in federal court.

> When Congress authorized federal employees to sue the federal government for violation of the civil rights laws, it conditioned such authorization on the "plaintiff's satisfaction of 'rigorous administrative exhaustion requirements and time limitations.'" One of these requirements is that the "aggrieved person must initiate contact with a[n EEO] Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action." Timely contact with an EEO counselor is an administrative remedy that a federal employee must invoke before he may bring a claim of employment discrimination in federal district court.

*Horton v. Potter,* 369 F.3d 906, 910 (6th Cir. 2004) (citations omitted). For purposes of determining whether a Title VII plaintiff has complied with statutory time limitations, the U.S. Supreme Court in *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101 (2002), has drawn a distinction between

9

discrete discriminatory acts and a series of separate acts that collectively constitute a hostile work environment. Discrete acts include termination, failure to promote, and denial of transfer. *Id.* at 114. The limitations period for bringing such claims begins to run from the date on which the act occurred. *Horton,* 369 F.3d at 910.

Hostile environment claims, on the other hand, "are different in kind from discrete acts. Their very nature involves repeated conduct." *Morgan,* 536 U.S. at 115. The discrimination or harassment

> occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. Such claims are based on the cumulative effect of individual acts. . . . In determining whether an actionable hostile work environment claim exists, the Court must look to "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."

*Id.* at 116 (citations omitted).

In order for a hostile work environment claim to be timely, a Title VII plaintiff need only initiate contact with an EEO counselor within 45 days of any act that is part of the hostile environment. *Id*. at 118. It is therefore inconsequential, for timeliness purposes, if some of the component acts fall outside the statutory time period. *Id*. at 117.

Ferguson argues that the district court ignored the second part of *Morgan's* holding when it considered each non-promotion or denial of promotional opportunity as a discrete act instead of viewing the instances of non-selection as a series of acts that together create a hostile work environment. In addition, Ferguson argues that *Morgan* leaves unanswered whether a series of acts that take place over a period of years and result in the filing of grievances and numerous EEO

10

complaints can form the basis for a hostile environment claim. Ferguson refers the Court to *Johnson v. United Parcel Service, Inc.,* 117 F. App'x 444 (6th Cir. 2004) (unpublished), to support her claim that discrete acts of non-promotion that occur outside the statutory period can be considered as component acts of a hostile work environment claim as long as one of the acts takes place within the limitations period. *Johnson* is distinguishable. There, the plaintiff was denied a promotion which was allegedly awarded to a white employee with less seniority. In connection with the situation, a manager commented that the plaintiff, an African-American, would be assigned to a position "with his own kind" instead of being promoted. *Johnson,* 117 F. App'x at 457. Based on numerous instances of harassment including (but not limited to) this remark, the court held that there was sufficient evidence for a jury to find that the employee experienced a hostile work environment. *Id.* at 458. In *Johnson,* unlike in the case at bar, the totality of the circumstances revealed pervasive harassment. Here, the district court correctly found that "[a]side from denials of promotions, Ferguson has alleged only one incident of an overt racially discriminatory remark by [her manager] Reilly." J.A. at 51. This single offensive remark, standing alone, is not sufficient to establish a hostile work environment. *Morgan,* 536 U.S. at 115 (citing *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986)). Ferguson also argues that the district court never considered the claims relating to her grievances as a basis for a hostile environment claim. Ferguson filed three grievances between 1988 and 1993. These grievances involved a non-promotion, an unsatisfactory job performance evaluation and a reprimand. Even taken as a whole, the discrete acts underlying these grievances cannot be transformed into a hostile environment claim.

The district court correctly concluded that the instances of non-selection and denial of promotional opportunities did not together amount to a hostile work environment. Accordingly,

11

because Ferguson did not contact an EEO counselor at all regarding any non-selection or denial of job opportunity between 1982 and March 1995, those claims are time-barred.

**B. Motion in Limine**

Next, Ferguson argues that the district court erred in granting the Secretary's motion to exclude as irrelevant evidence of the 1997 settlement agreement. Under the terms of the 1997 settlement agreement, the IRS agreed to assign Ferguson to QMS for a period of 18 to 30 months.

This court reviews a district court's evidentiary rulings for an abuse of discretion. *See Tompkin v. Philip Morris USA, Inc.,* 362 F.3d 882, 897 (6th Cir. 2004). Prior to trial, the Secretary filed a motion in limine to exclude, among other things, evidence regarding the settlement agreement pursuant to Federal Rules of Evidence 401, 402 and 602. The following day, the court held a final pretrial conference at which time defense counsel was given an opportunity to respond to the motion. Based on its prior ruling on summary judgment that it lacked jurisdiction over the breach of settlement agreement claim, the district court excluded any evidence of the settlement agreement "because that would be taking up matters outside the Court's jurisdiction." J.A. at 892 (Tr. of Final Pretrial Conference).

Jackie Abraham served as Ferguson's manager when Ferguson was assigned to QMS in August 1997. When the case proceeded to trial, Abraham testified that at the time Ferguson commenced her detail with QMS, she knew that Ferguson had engaged in EEO activity. In fact, Abraham stated that she knew Ferguson had filed an EEO complaint against *her*. Immediately thereafter, Ferguson's counsel broached the subject of settlement. An objection by defense counsel was sustained. During the following sidebar, Ferguson's counsel argued that testimony that Abraham knew Ferguson was assigned to QMS as a result of a settlement agreement was relevant.

12

The district court stated that introducing evidence of a settlement agreement might suggest some liability on the part of the agency. The district judge then stated as follows: "[f]or retaliation purposes, I think it's sufficient that you ask the witness, were you aware she was engaged in any EEO activity. She said yes, part of it was against me. That was sufficient. We don't need to get into the settlement agreement." J.A. at 825.

On appeal, Ferguson claims she should have been permitted to introduce evidence of the settlement agreement at trial. According to Ferguson, Abraham knew that her assignment to QMS was a result of a settlement of an EEO complaint, and evidence of the settlement should have been admitted to show motive pursuant to Federal Rule of Evidence 408.[3] Specifically, Ferguson argues that evidence of settlement should have been admitted to show Abraham's motive for engaging in two acts of retaliation: (1) conducting a 100% review of Ferguson's work, which Ferguson characterizes as unprecedented, and (2) intentionally downgrading Ferguson's performance evaluations. However, Ferguson's counsel did not raise the issue of motive nor refer the district court to Rule 408 either at the final pretrial conference or in response to the Secretary's objection

---

[3]Rule 408 provides, in pertinent part, as follows:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. *This rule also does not require exclusion when the evidence is offered for another purpose,* such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

FED. R. EVID. 408 (emphasis added).

13

at trial. This Court will not consider arguments raised for the first time on appeal unless our failure to consider the issue will result in a plain miscarriage of justice. *Rush v. Illinois Central Railroad Co.,* 399 F.3d 705, 725 (6th Cir. 2005).

At trial, Ferguson's attorney successfully elicited testimony that Abraham was aware of Ferguson's EEO activity prior to Ferguson's assignment to QMS in August 1997. This testimony is sufficient to demonstrate the element of knowledge in a Title VII retaliation claim. Evidence of the settlement agreement would cause undue prejudice to the agency by suggesting, as the district court put it, some concession of liability. Accordingly, the district court did not abuse its discretion in excluding evidence of the settlement at trial.

## C. Judgment as a matter of law

Ferguson argues that the district court erred in granting the Secretary's motion for judgment as a matter of law on her 1999 failure to promote claim.[4] A district court's grant of judgment as a matter of law is reviewed de novo. *Scotts Co. v. Central Garden & Pet Co.,* 403 F.3d 781, 788 (6th Cir. 2005). "[A] court should render judgment as a matter of law when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 149 (2000) (quoting FED. R. CIV. P. 50(a)). In entertaining a Rule 50 motion, the court should

---

[4]During oral argument on the motion for judgment as a matter of law, Ferguson's counsel alleged that the 1999 non-promotion claim alleged race discrimination as well as retaliation. It appears that the district court, however, regarded the claim as one of race discrimination only. The district court's ruling that Ferguson did not show that the government's preferred reason for its employment decision was pretextual would apply to a non-promotion claim based on both discrimination and retaliation. In any event, Ferguson does not raise this issue on appeal.

14

review all of the evidence in the record, drawing all reasonable inferences in favor of the nonmoving party. *Id.* at 150. The court may not make credibility determinations or weigh the evidence. *Id.*

> Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses."

*Id.* at 151 (citations omitted). This Court has previously held that *Reeves* does not stand for the proposition that the district court must ignore all testimony by witnesses associated with the defendant. *Almond v. ABB Indus. Sys., Inc.,* 56 F. App'x 672, 675 (6th Cir. 2003) (unpublished). While the court may consider "'uncontradicted and unimpeached evidence from disinterested witnesses,' . . . under some circumstances even the testimony of an 'interested witness . . . must be believed.'" *Id.* (quoting 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2527 at 286-87); *see also Stratienko v. Cordis Corp.,* 429 F.3d 592, 598 (6th Cir. 2005) (discussing *Almond*).

> In particular, "[t]he testimony of an employee of the [movant] must be taken as true when it disclosed no lack of candor, the witness was not impeached, his credibility was not questioned, and the accuracy of his testimony was not controverted by evidence, although if it were inaccurate it readily could have been shown to be so.

*Almond,* 56 F. App'x at 675 (alteration in original) (quoting Wright & Miller, *supra,* § 2527, at 287 n.9). Besides minor inconsistencies regarding whether Polen or Childs was hired first and whether Rhoton made one or two requests for additional staff, the testimony offered by defense witnesses Rhoton and Lee was uncontradicted and unimpeached. The Secretary presented uncontroverted evidence that no vacancies were available at the time the two employees were transferred into QMS.

15

A Title VII plaintiff has the burden of proving a prima facie case of race discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). If the plaintiff succeeds in proving her prima facie case, the burden then shifts to the employer to articulate some legitimate, non-discriminatory reason for the adverse employment action. *Leadbetter v. Gilley*, 385 F.3d 683, 690 (6th Cir. 2004). "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves,* 530 U.S. at 142 (citation omitted). Assuming, *arguendo,* that Ferguson established her prima facie case, the Secretary met its burden by offering admissible evidence sufficient for the trier of fact to conclude that the agency did not deny Ferguson a promotional opportunity because there was no GS-13 vacancy that could be announced; rather, Childs and Polen were brought into QMS pursuant to a hardship request and a pregnancy accommodation. Once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision, the plaintiff must then prove by a preponderance of the evidence that the employer's stated reasons were merely a pretext for discrimination. *Id*. at 143. Ferguson claims that Lee's decision to transfer in two employees whose qualifications did not meet the needs of the department provides evidence of pretext. Specifically, Ferguson alleges that Childs and Polen had no QMS experience and computer expertise was not even used in QMS.

Michael Rhoton testified that 90% of the employees assigned to QMS have no prior experience. In addition, Ferguson does not provide any evidence supporting her claim that an employee assigned to the QMS must have prior experience in that department. The only support for this claim is Ferguson's allegation that she was not selected for a QMS position in March 1995 due to lack of experience. This allegation, standing alone, is insufficient to show that the Secretary's stated reason for its employment action was pretextual. As for Ferguson's claim that computer skills

16

were not used in the QMS, this bald assertion is unaccompanied by any evidentiary support. Furthermore, even if computer expertise was never used in the QMS in the past, Lee testified that the talent was something he could not afford to lose and would improve the quality of his operations.

Ferguson also argues that the collective bargaining agreement between the union and the agency ("NORD V") did not permit the two positions to be filled at level GS-13; rather, the positions could only be filled at grade 11. The relevant provisions of the NORD V provide as follows:

> B. Absent a decision by the Employer to reassign above the journey level [i.e., GS-11], all hardship relocation recipients who are above the journey level will be limited to entitlement to positions in their current occupation at the journey level.

> E. When the hardship eligible is above the journey level, assignment changes will be made based on the following.

> > 1. When there is no open vacancy announcement . . . for a position above the journey level, the Employer has the option of assigning the hardship eligible at the journey level or up to the employee's current grade.

J.A. at 334 (NORD V, Article 15, Section 5 ("Hardship Reassignments")). Read together, these sections appear to allow some flexibility to the gaining office when assigning a hardship eligible who is above the GS-11 journey level. In addition, Lee testified that his policy was to allow hardship eligibles to maintain the grade level earned from their prior position. Even if the NORD V did not permit a GS-13 hardship relocation recipient to maintain his grade level after transfer, Ferguson has not shown that Lee's decision to allow hardship candidates to maintain their grade level upon transfer supports a finding of pretext. In addition, the NORD V provisions governing part-time accommodation for pregnant employees and employees with young children do not require

17

the agency to assign such employees to positions at the journey level. The relevant provisions read as follows:

> The Employer will make a reasonable effort to accommodate a pregnant employee's request for a modification of duties or a temporary assignment when the request is supported by acceptable medical evidence.

> Absent just cause, and to the extent provided by law, the Employer will provide part-time or job sharing opportunities for employees who have children under six (6) years of age . . . .

J.A. at 365 (NORD V, Article 33 ("Family Leave"), Sections 3 & 5).

Ferguson also claims she was replaced by a GS-13 white female after leaving QMS. Rhoton testified that a woman was brought into QMS as a hardship transfer after Ferguson left, but he did not know who she replaced. More importantly, Ferguson does not claim that she was denied a position that ultimately went to a white female. Rather, the white female employee was brought in after Ferguson rotated out of QMS or took leave from QMS. Without more, this allegation does not provide sufficient evidence of pretext.

Finally, Ferguson claims that the district court impermissibly weighed evidence and determined that the agency's rationale for transferring Polen and Childs into QMS was credible. This argument is not well-taken. Based on the evidence presented at trial, the district court found that the two positions that were filled were not actual promotions. One employee was brought in pursuant to a hardship request and the second employee was laterally hired as an accommodation for a pregnancy. The district court stated that Ferguson made no showing that either of those decisions were pretextual or unworthy of belief.

Whether judgment as a matter of law is appropriate depends on a number of factors including "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's

18

explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Reeves,* 530 U.S. at 148-49.

> [A]n employer would be entitled to judgment as a matter of law if the record conclusively revealed some . . . nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred. To hold otherwise would be effectively to insulate an entire category of employment discrimination cases from review under Rule 50, and we have reiterated that trial courts should not "'treat discrimination differently from other ultimate questions of fact.'"

*Id.* at 148 (citations omitted); *Noble v. Brinker Int'l, Inc.,* 391 F.3d 715, 726 (6th Cir. 2004), *cert. denied,* 126 S. Ct. 353 (2005) ("The *Reeves* Court . . . require[s] that a plaintiff present *both* evidence supporting a *prima facie* case *and* evidence sufficient to support the factfinder's disbelief of the defendant's proffered reason.").

Ferguson has not produced sufficient evidence that the Secretary's asserted justification is false. She has presented no evidence that Childs and Polen entered QMS pursuant to actual vacancies for which she should have been able to compete. In fact, Ferguson had the opportunity to compete for GS-13 positions in the year preceding the transfers. At that time, the agency filled over 100 vacancies pursuant to an announcement for competitive selections. Ferguson chose not to apply for any of those vacancies. Accordingly, the district court did not err in granting the Secretary's motion for judgment as a matter of law on Ferguson's 1999 failure to promote claim.

## IV. CONCLUSION

For the foregoing reasons, the judgment of the district court is **AFFIRMED.**

19