**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

**File Name: 06a0929n.06**

**Filed: December 22, 2006**

**No. 05-6729**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | |
|---|---|
| **MICHAEL EL-ZABET,** ) | |
| ) | |
| **Plaintiff-Appellant,** ) | |
| ) | **ON APPEAL FROM THE** |
| v. ) | **UNITED STATES DISTRICT** |
| ) | **COURT FOR THE EASTERN** |
| **NISSAN NORTH AMERICA, INC.,** ) | **DISTRICT OF TENNESSEE** |
| ) | |
| **Defendant-Appellee.** ) | |
| ) | |

BEFORE:     BOGGS, Chief Judge; COOK, Circuit Judge; and ROSE, District Judge.[*]

PER CURIAM.  Michael El-Zabet, a naturalized American citizen of Jordanian origin, sued Nissan, his former employer, for employment discrimination.  The district court granted summary judgment for Nissan.  El-Zabet appeals with respect to five claims: a claim brought under 42 U.S.C. § 1981, and claims brought under Title VII of the 1964 Civil Rights Act and the Tennessee Human Rights Act alleging a hostile work environment, discriminatory failure to promote, discriminatory discharge, and retaliatory discharge.  We affirm.

I

---

[*]The Honorable Thomas M. Rose, United States District Judge for the Southern District of Ohio, sitting by designation.

No. 05-6729
El-Zabet v. Nissan N. Am., Inc.

We review an order granting summary judgment *de novo*. *See Trs. of the Mich. Laborers'*
*Health Care Fund v. Gibbons*, 209 F.3d 587, 590 (6th Cir. 2000). Summary judgment is appropriate
"if the pleadings, depositions, answers to interrogatories and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party
is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "When reviewing a motion for
summary judgment, the facts, and any inferences drawn therefrom, must be viewed in the light most
favorable to the nonmoving party." *Melson v. Prime Ins. Syndicate, Inc.*, 429 F.3d 633, 636 (6th Cir.
2005).

II

We agree with the district court that El-Zabet failed to state a claim under Section 1981. El-
Zabet alleged only discrimination based on national origin, while Section 1981 prohibits only
discrimination based on race.

Section 1981 states that "[a]ll persons within jurisdiction of the United States shall have the
same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white
citizens . . . ." 42 U.S.C. § 1981. This mandate applies to private contracts as well as public ones.
*Runyon v. McCrary*, 427 U.S. 160, 168, 174-175 (1976). Even though Section 1981 does not use
the word "race," the Supreme Court has held that it prohibits only racial discrimination, not
discrimination based "solely on the place or nation of [] origin." *Saint Francis Coll. v. Al-Khazraji*,
481 U.S. 604, 613 (1987).

El-Zabet's pleadings indicate that he based his claim under Section 1981 solely on allegations
of national origin discrimination. In explaining the factual predicate of his claims, his complaint

–2–

does not mention race, stating only that he "is of Middle Eastern origin, which is a member of the

protected classes [sic] of citizens under Title VII of the Civil Rights Act of 1964." In alleging a

violation of Section 1981, the complaint says that the conduct he alleged "constitutes harassment and

discrimination *on the basis of national origin* [in violation] of 42 U.S.C. [§] 1981" (emphasis

added). The only time the complaint mentions race at all is an ambiguous statement contained in

the section alleging a violation of Title VII:

> The intentional conduct and actions by the Defendant through its agents constitute
> unlawful conduct and actions by Defendant through its agents constitute unlawful
> employment practices (National origin and racial harassment) that discriminated
> against plaintiff with respect to his terms, conditions and/or privileges of
> employment, in violation of Title VII of the Civil Rights Act of 1964 . . . .

Similarly, in his EEOC charge, El-Zabet marked the box for national origin discrimination but not

the box for racial discrimination and stated that he believed he "was discriminated against because

of [his] national origin, Middle Eastern . . . ." *Cf. Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir.

2001) (holding that a plaintiff stated a claim under Section 1981 when her complaint alleged only

national origin discrimination, but her EEOC charge also alleged racial discrimination).

One cannot fairly read either the complaint or the EEOC charge to indicate that El-Zabet

wished to base a section 1981 claim on anything other than a claim of national-origin discrimination.

Since it is legally impossible to state a claim for national-origin discrimination under section 1981,

the district court properly granted summary judgment for Nissan on that claim.

III

El-Zabet bases his remaining claims on Title VII of the 1964 Civil Rights Act, 42 U.S.C. §§

2000e to 2000e-17, and the Tennessee Human Rights Act, Tenn. Code Ann. §§ 4-21-101 to -1004.

No. 05-6729
El-Zabet v. Nissan N. Am., Inc.

The two statutes are practically identical in substance. *Frizzell v. Sw. Motor Freight*, 154 F.3d 641, 646 (6th Cir. 1998) ("The Tennessee Supreme Court has held that courts may use federal case law assessing claims under Title VII to analyze THRA claims." (citing *Campbell v. Fla. Steel Corp.*, 919 S.W.2d 26, 31 (Tenn. 1996))); *see also Kestner v. Stanton Group, Inc.*, No. 06-0759, 2006 U.S. App. LEXIS 25610, at *6 (6th Cir. Oct. 12, 2006) (unpublished) ("[T]he disposition of [a plaintiff's] Title VII claims resolves her [Tennessee] state-law claims as well."). They differ, however, with respect to the applicable statute of limitations.

Title VII requires a party wishing to contest an allegedly discriminatory act to file a charge with the EEOC within 300 days of the act, if the party "initially instituted proceedings with a State or local agency" qualified to provide relief, or within 180 days, if the party did not do so. 42 U.S.C. § 2000e-5(e)(1). While Tennessee has a state system of administrative remedies qualified to provide relief under Section 2000e-5(e)(1), *see Jackson v. Richards Med. Co.*, 961 F.2d 575, 579 (6th Cir. 1992) (citing Tenn. Code Ann. § 4-21-101), nothing in the record indicates that El-Zabet instituted proceedings with a state or local agency. Therefore, the 180-day time limit applies. El-Zabet filed his EEOC charge on July 23, 2003. Only events occurring after January 24, 2003, fall within the Title VII limitations period.

The Tennessee Human Rights Act permits a party to seek relief in one of two ways. First, he can file an administrative complaint with the Tennessee Human Rights Commission and then seek judicial review if the Commission rules against him. *See* Tenn. Code Ann. §§ 4-21-302, -307(a). Nothing in the record indicates that El-Zabet filed a state administrative complaint. Second, a party can bypass the administrative-complaint process and file suit directly, *id.* § 4-21-311(a), in which

–4–

case he must file his complaint within one year of the allegedly discriminatory action, *id.* § 4-21-311(d). El-Zabet filed his complaint on February 4, 2004. Only events occurring after February 4, 2003 fall within the THRA limitations period. Because no relevant events took place between January 23, 2003, and February 4, 2003, the same limitations issues affect El-Zabet's Title VII and THRA claims.

El-Zabet mentions five events that occurred during the limitations period. In April 2003, he filed an internal complaint with Mark Stout, an employee in Nissan's Human Resources Department, stating that his manager, Larry Worsham, was discriminating against him by refusing to give him a timely performance evaluation. In early May 2003, El-Zabet received a poor performance review from Worsham, echoing poor reviews that he had received in 2001 and 2002 from previous managers. On May 29, 2003, Nissan placed him on a Performance Improvement Plan. On July 11, 2003, he was put on paid leave for over a week after sending a hostile e-mail to Worsham (though nothing in the record indicates that El-Zabet viewed that event as an example of discrimination). Finally, on July 22, 2003, he left his job at Nissan – because Nissan fired him, according to him, or because he quit, according to Nissan. El-Zabet can base his Title VII and THRA claims only on those five events unless he can link those events to prior events through the "continuing violation" doctrine.

## A

Given this background, El-Zabet's claims based on Nissan's failure to promote him must fail. The continuing violation doctrine generally does not apply to failure-to-promote claims because Title VII "precludes recovery for *discrete acts* of discrimination or retaliation that occur outside the

statutory time period." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002) (emphasis added). A failure to promote counts as a "discrete act" under *Morgan*. *Id.* at 113-14. All of El-Zabet's failure-to-promote claims involve jobs he sought, and was rejected for, prior to January 24, 2003. Those claims are time-barred.

B

El-Zabet also cannot survive summary judgment on his claims alleging a hostile work environment.

In the context of a hostile work environment claim, "[t]o establish a continuing violation, [a] plaintiff must first produce evidence of a 'current' violation taking place within the limitations period. Second, [a] plaintiff must show that the current violation . . . is indicative of a pattern of similar discriminatory acts continuing from the period prior to the limitations period." *Weigel v. Baptist Hosp. of East Tenn.*, 302 F.3d 367, 376 (6th Cir. 2002) (quoting *Gallagher v. Croghan Colonial Bank*, 89 F.3d 275, 278 (6th Cir. 1996)). The four events that could constitute a "current violation" in this case all involve Nissan's evaluation of El-Zabet's performance: an internal complaint about not receiving a timely evaluation, a poor evaluation, his placement on a Performance Improvement Plan, and his termination. The only earlier events that could constitute "similar discriminatory acts" are other poor performance reviews and the imposition of a previous Performance Improvement Plan. Without more, negative performance assessments cannot "create an environment that a reasonable person would find hostile or abusive." *Smith v. Leggett Wire Co.*, 220 F.3d 752, 760 (6th Cir. 2000); *see also Ferguson v. Snow*, 185 F. App'x 456, 2006 U.S. App. LEXIS 14844, at *19 (6th Cir. 2006) (holding that "a non-promotion, an unsatisfactory job

performance evaluation and a reprimand," all allegedly motivated by discriminatory animus, were not enough to support a hostile work environment claim).

To provide "more," El-Zabet relies on various instances of personal harassment. Between 1997 and 2001, while El-Zabet was working at a Nissan facility in Smyrna, Tennessee, his co-workers allegedly subjected him to racially charged insults, calling him "camel jockey" and "sand nigger." This harassment by co-workers stopped in April 2001, when El-Zabet received a promotion and moved to a different Nissan facility in Decherd, Tennessee. However, El-Zabet's first supervisor at Decherd, Bryan Donath, also allegedly engaged in hostile behavior toward El-Zabet. Donath called El-Zabet insulting names (such as "scrap bitch"), made inflammatory comments about politics in the Middle East (such as a statement on September 11, 2001, that "we need to nuke all those people in the Middle East"), and, in an alleged attempt at humor, sent an e-mail including a fictional police report referring to El-Zabet as a "possible Arab terrorist." Donath left Nissan in March 2002, and El-Zabet does not claim that he suffered any similar personal harassment after Donath's departure.

The alleged harassment by El-Zabet's co-workers at Smyrna and by Donath occurred outside the limitations period. And El-Zabet cannot use the continuing violation doctrine to link those distant events to the incidents that took place within the limitations period. Applying the standard we articulated in *Weigel*, the alleged current violation is neither "similar" to the past violations (since the former involved negative performance assessments and the latter involved personal slurs) nor "continuing from" the past violations (since over eleven months passed between Donath's departure

and the first allegedly discriminatory event within the limitations period). *Weigel*, 302 F.3d at 376.

The district court properly granted summary judgment on the hostile work environment claims.


C


To establish a prima facie case of discriminatory termination, a plaintiff must demonstrate

that "1) she is a member of a protected class; 2) she was qualified for the job and performed it

satisfactorily; 3) despite her qualifications and performance, she suffered an adverse employment

action; and 4) she was replaced by a person outside the protected class or was treated less favorably

than a similarly situated individual outside her protected class." *Logan v. Denny's, Inc.*, 259 F.3d

558, 567 (6th Cir. 2001) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). El-

Zabet fails to satisfy the fourth requirement.

El-Zabet produced no evidence indicating who replaced him. Consequently, he can prevail

only if he was treated less favorably than a similarly situated individual outside the protected class.

To determine whether he was treated less favorably, we must examine the diverging accounts of the

events surrounding El-Zabet's termination.

On July 22, 2003, El-Zabet returned to work after over a week of paid leave. He met with

Worsham, his supervisor, and Mark Stout, an employee in Nissan's Human Resources department.

In a memorandum "to file," Stout presented a detailed account of what happened at this meeting:

> Michael stated he could not abide by the performance plan. Michael felt there were
> too many issues and too much damage to him personally and to his career. I then
> communicated that part of the condition of his continued employment was his full
> cooperation with the performance plan. . . . He stated yes [that he would not work
> under the plan]. I further informed him that failure to do so would mean his decision

> [was] to no longer work at Nissan. Michael stated he fully understood his decision, but it was one he must do.

Thus, according to Stout, El-Zabet quit his job voluntarily.

El-Zabet gave a similar account in his EEOC charge and complaint. In the EEOC charge, he wrote:

> I told them I needed a letter in my file rescinding the poor evaluations, and stating the harassment and intimidation would stop, and I wanted the remaining 50% of my bonus paid to me. They said that could not be done, and I stated that I could not continue to work under such stressful and adverse conditions. They replied that is termination.

In his complaint, he stated: "Upon returning to work a week later as instructed, Plaintiff was terminated for job abandonment and his refusal to participate in the performance management process."

At his deposition, however, El-Zabet told a different story. He stated that he told Worsham and Stout that he would follow the Performance Improvement Plan, but that he "didn't want no harassment." He claimed that he then asked for "legal advice and somebody who can speak for me" and that Stout responded by saying "that means termination." It is not clear, however, whether El-Zabet claimed that he was fired because he requested to have a lawyer present at his meetings with company officials, or simply that he quit when the company refused to permit him to have a lawyer present.

Thus, the record contains four different accounts of why El-Zabet's employment ended. Regardless of which account is true, El-Zabet offered no evidence that a similarly situated employee was treated differently. He offered no evidence that Nissan retained any other employee who refused

to follow a Performance Improvement Plan, no evidence that Nissan agreed to change poor evaluations for any other employee or pay a full bonus despite poor evaluations to any other employee, and no evidence that Nissan permitted any other employee to have an attorney present at a disciplinary meeting (or even retained any other employee who requested to have an attorney present). The district court properly granted summary judgment on El-Zabet's discriminatory discharge claim.

D

"A prima facie case of retaliation has four elements: 1) the plaintiff engaged in legally protected activity; 2) the defendant knew about the plaintiff's exercise of this right; 3) the defendant then took an employment action adverse to the plaintiff; and 4) the protected activity and the adverse employment action are causally connected." *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001). Assuming *arguendo* that El-Zabet's request to have an attorney present at his disciplinary meeting was protected activity, El-Zabet's retaliatory discharge claim still fails because he has not presented evidence from which a reasonable fact-finder could infer that he suffered an adverse employment action as a result of that protected activity.[1]

---

[1]An employee has engaged in protected activity when "he has opposed any practice made an unlawful employment practice by this title" (the opposition clause) or when "he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title" (the participation clause). 42 U.S.C. § 2000e-3(a). El-Zabet clearly engaged in protected activity under the opposition clause when he made his internal complaint to Stout in April 2003, but he never claimed that the company terminated him because of that protected activity. Because he wanted an attorney to "speak for" him in order to prevent future "harassment" based on national origin, his request for an attorney also might qualify as protected opposition, though we need not and do not decide whether it does.

Except in cases of constructive discharge, resignation cannot constitute an adverse employment action. *Goldmeier v. Allstate Ins. Co.*, 337 F.3d 629, 635 (6th Cir. 2003). El-Zabet never argued that he was constructively discharged. Consequently, El-Zabet's retaliatory discharge claim can survive summary judgment only he can demonstrate the existence of a genuine issue of material fact as to whether he was terminated. We do not believe that such a genuine issue exists. The only piece of evidence that even could suggest that El-Zabet was fired is a single line from his deposition testimony: "when I said, you know, I need to seek legal advice and somebody who can speak for me, and Mark Stout, you know, he says that means termination." As noted earlier, this statement could mean that El-Zabet was fired or that he quit when Nissan refused to permit him to have a lawyer present. The rest of the evidence strongly supports the latter reading. Stout's account of the July 22 meeting, El-Zabet's EEOC charge, and El-Zabet's complaint all indicate that El-Zabet asked Nissan for changes in his conditions of employment and decided that he "could not" or would not continue to work when Nissan declined to honor his requests.

Though Rule 56 requires us to view the facts in the light most favorable to El-Zabet, it also demands that the non-movant "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). El-Zabet cannot meet that burden by relying on an ambiguous line of testimony directly contradicted by his own complaint and EEOC charge. The district court properly granted summary judgment on the retaliatory discharge claim.

IV

The judgment of the district court is therefore affirmed.